**Baby Boy VAN WEY, Movant,**

v.

**Christine VAN WEY, Raymond F. O'Neal and Donna O'Neal, Respondents.**

**and**

**Raymond F. O'NEAL and Donna O'Neal, His Wife, Movants,**

v.

**Christine VAN WEY, Respondent.**

Supreme Court of Kentucky.

July 6, 1983.

Rehearing Denied Oct. 12, 1983.

E. Irene P. Long, Bedford, Stephen P. Smith, Jr., Louisville, for movants.

Ellen G. Friedman and Robert F. Smith, Legal Aid Soc., Inc., Louisville, for respondents.

Charles W. Dobbins, Jr., Louisville, guardian ad litem for Baby Boy Van Wey.

LEIBSON, Justice.

In November 1980, Christine Van Wey, a resident of Muscatine, Iowa, contacted attorney Katie Brophy of Louisville, Kentucky and solicited her aid in arranging for the birth and placement for adoption of her unborn child. Ms. Van Wey, the mother of two daughters, ages 5 and 7, was separated from her husband, deserted by the man she was living with, and apparently destitute.

Ms. Brophy arranged for Ms. Van Wey to come to Louisville to deliver the unborn child. She also arranged for a prospective adoptive couple, Raymond F. and Donna O'Neal. The O'Neals assumed financial responsibility for all fees and expenses attendant to birth and adoption of the child by the O'Neals.

Ms. Van Wey came to Louisville with her two daughters, lived in the home of Ms. Brophy's secretary for approximately two months preceding the birth of the child, and with the assistance and direction of Ms. Brophy went through all the medical and legal steps preparatory for the birth and adoption of the child. This included a trip to the Kentucky Department of Human Resources where she met with an adoption worker and reviewed her application to place the unborn child for adoption. The worker subsequently approved that application. The O'Neals were approved for placement of the child in their home. Immediately before the child's birth, Ms. Van Wey signed a consent form permitting Ms. Brophy to obtain immediate possession of the newborn child to deliver to the O'Neals.

Baby Boy Van Wey was born January 22, 1981, at the Norton-Children's Hospital, Louisville, Kentucky. On January 25, 1981, Ms. Brophy picked up the infant at the hospital and delivered him to the O'Neals. But by now Ms. Van Wey had formed an emotional attachment for the child. She told hospital personnel that she had changed her mind about her plans to place the child for adoption and she contacted a social worker for assistance. She later testified to a heated telephone conversation with Ms. Brophy and Ms. Brophy's secretary and to threats and attempts at intimidation, which are denied. Through the social worker she contacted an attorney with the Legal Aid Society in Louisville, who offered assistance and attempted to allay her fears. The Legal Aid Society attorney then notified Ms. Brophy that Ms. Van Wey intended to seek return of the infant. But instead of doing so, later that evening she contacted Ms. Brophy and indicated to her that she had again changed her mind, that she wanted to appear the following day in court for the purpose of terminating her parental rights, and then take her other two children and go home to Iowa. The O'Neals were so notified.

The following morning, January 27, 1981, Ms. Van Wey went to Ms. Brophy's office, and then, with her to the courthouse. She executed a "Petition for Voluntary Termination of (her) Parental Rights," under oath before the Deputy Clerk. She went with Ms. Brophy to the chambers of the Honorable Jack E. Mudd, Jefferson Circuit Court, to whom the case was allotted. Judge Mudd conducted a hearing during which he explained to her the legal consequences of her actions and satisfied himself as to the voluntary and informed nature of her acts. At that point, Ms. Van Wey had taken all steps that would be necessary on her part in order for a judgment terminating her parental rights to be entered. However, there were other steps involved that would not involve Ms. Van Wey. Those were appointment of a Guardian Ad Litem to accept

service for the child and represent the infant if necessary and a Warning Order procedure against Ms. Van Wey's estranged husband who was named in the petition so that his parental rights could also be terminated. A copy of the letter to the O'Neals from the Department for Human Resources approving them for home placement of the child and subsequent independent adoption procedures was filed with the petition.

Ms. Van Wey took money from Ms. Brophy for her expenses and returned to Iowa with her two children. But she did not forget about her newborn baby. Two weeks later she wrote to Judge Mudd, stating that she had gone through with the hearing because she was threatened and intimidated by Ms. Brophy, that she did not want her parental rights terminated and that she wanted "to have my parental rights reinstated."

The father of the child was represented as "unknown" when the petition was sworn to before a Deputy Clerk and at the time of the hearing before Judge Mudd. But Ms. Van Wey had now reestablished her former living arrangements with another man, and he filed an affidavit that he was the father of the child and stated "I do not want to give up my parental rights."

Ms. Van Wey then recontacted the Legal Aid Society attorney. On April 30, 1981, through this new attorney, Ms. Van Wey filed a "Petition for Immediate Entitlement, Possession and Custody", stating that the Petition for Voluntary Termination was signed under "duress," that she "revokes" her consent to the termination of her parental rights, and seeks possession and custody of Baby Boy Van Wey.

Thus, the issue is joined. On the one hand, the O'Neals ask the court for a judgment terminating Ms. Van Wey's parental rights, so they can proceed with the adoption. On the other hand, Ms. Van Wey seeks to revoke her consent to termination of her parental rights and regain possession and custody of her child. But this is not just a two-sided law suit. The third party, with an interest in the outcome at least as great as the first two, is Baby Boy Van

Wey. He is represented in this litigation by a Guardian Ad Litem, appointed by the court to protect his interests and his interests alone. The report of the Guardian Ad Litem was "that the welfare and best interests of the child will continue to be protected in the home of the prospective adoptive parents."

Judge Mudd conducted a full-scale hearing on June 17, 1981. The issues at that hearing included:

1) Was Ms. Van Wey's consent obtained in the first instance by duress or coercion?

2) Did Ms. Van Wey have a right to revoke her consent or withdraw her petition at any time before judgment regardless of whether or not her acts were initially voluntary?

3) Should the question of termination be decided on the basis of the law that relates to voluntary termination, KRS 199.601, or the law that relates to involuntary termination, KRS 199.603?

The voluntary termination statute provides that "the best interest of the child shall be considered paramount." The involuntary termination statute also provides for termination "in the best interest of the child," but decides the question on the narrow grounds of parental "abandonment, neglect or abuse." In other words the parent must be found unfit before involuntary termination takes place.

The trial court made extensive Findings of Fact and Conclusions of Law in an order dated June 22, 1981 and supplemented July 8, 1981. It concluded that whatever the evidence as to Ms. Van Wey's emotional distress and her fears before the time of the hearing in the court's presence on January 27, 1981, the "legal steps to complete the voluntary termination of her parental rights . . . taken by her before this court (on that date) were not the result of threats or duress at that time." There was ample evidence to support the conclusion of the court that Ms. Van Wey, who had first wanted the placement and adoption and then changed her mind, had again changed

her mind at the time she was in court January 27, 1981.

Having found that the consent should not be set aside for duress, the court then concluded:

> "The final and most important factor in reaching a decision in this case is the best interest of the baby himself. This should be of paramount concern and no decision can be or should be made in conflict with this best interest."

Using the "best interest of the child" standard, the court recited several significant findings as to why the child's best interest would be served by remaining with the O'Neals. Ms. Van Wey's Petition for Immediate Possession and Entitlement to Custody, which included her effort to revoke her consent, was denied and her parental rights were terminated. The court also terminated the parental rights of her husband, who denied being the child's father and made no defense. The person now represented as the child's father did not intervene and was not a party to the litigation.[1] Neither the husband nor the putative father is a party to this appeal.

■ On appeal to the Court of Appeals the judgment was reversed and remanded. The opinion of the Court of Appeals is somewhat contradictory. First, in dealing with the finding of the trial court that Ms. Van Wey was not acting from undue influence or duress at the time of the voluntary termination proceedings on January 27, 1981, the court stated "we need not, and therefore do not, specifically determine that the trial judge's finding is clearly erroneous." On the other hand, the Court held that "the consent in this case cannot be considered to be voluntary." If the Court of Appeals means that the consent given at the time of the hearing before Judge Mudd cannot be considered to be voluntary, there is ample evidence in the record to support Judge Mudd's conclusion to the contrary.

However, the key issue on this appeal stems from the decision by the Court of Appeals "that Ms. Van Wey made a timely revocation of any consent which she originally gave, even if such was voluntary." It is undisputed that Ms. Van Wey has notified the court that she revokes her consent. But the question is whether she has an absolute right to thus terminate the proceedings, so that thereafter she can only have her parental rights terminated on standards related to involuntary termination, "abandonment, neglect or abuse," or whether the court, having found that consent was voluntarily given, should now consider the best interest of the child in deciding whether to allow Ms. Van Wey to revoke her consent or withdraw her petition. The Court of Appeals concluded:

> "As a matter of law, sufficient reason was given to revoke the petition to terminate. In order to thereafter issue a judgment in opposition to the wishes and consent of the natural mother, the conditions required for an involuntary termination must be clearly proven. There was no finding that Ms. Van Wey was an unfit mother."

■ We disagree. We agree with the trial court that, having found that the petition was initially voluntary, when the mother later attempted to revoke her consent, the court had a responsibility to consider the overall welfare of the child in deciding whether or not to permit such revocation. "Sufficient reason" means more than emotional distress at the time the petition for voluntary termination is filed. In the cases cited denying adoption when a mother revokes consent for "sufficient cause," there were elements of coercion or deception or the mother was not legally able to give consent. *Skaggs v. Gannon,* 293 Ky. 795, 170 S.W.2d 12 (1943); *Warner v. Ward,* Ky., 401 S.W.2d 62 (1966). Mother love alone would be sufficient reason to seek to revoke one's consent if "sufficient reason" had no limitations.

---

1. If and when the putative father undertakes legal steps, he will be faced with the United States Supreme Court decision in *Quilloin v.* *Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), *reh. den.* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511.

But Ms. Van Wey embarked upon a course of conduct over a period of two months directed at giving up possession and custody of her child and placing the child in a proper home for adoption. She has now changed her mind at least once, and, according to the view of the trial judge who heard the evidence, twice more—once back to giving up the child and then back once more to keeping the child. Something has changed. This child has been placed in the O'Neal's home for care, custody and adoption. Ms. Van Wey bears at least a share of the responsibility for this action. Once these steps have been taken, the fact situation has changed. The steps taken have legal consequences. The legal situation has also changed. We have sympathy and concern for both Ms. Van Wey and the O'Neals. But the Solomon type decision which must now be made does not turn on the feelings or wishes of either. The child's legal situation has changed. The legal decision is now squarely where the trial court put it: "The best interest of the child shall be considered paramount."

█ The handwritten letter from Ms. Van Wey to Judge Mudd dated February 9, 1981 shows that the infant was delivered voluntarily to the O'Neals. Ms. Van Wey writes that *after* the infant was discharged to the care of Ms. Brophy and had left the hospital "I knew I wanted him with me." KRS 405.020 establishes the *initial* right of the parent to custody of her child, but not the continuing right once custody has been relinquished. A long line of Kentucky cases beginning with *Lee v. Thomas,* 297 Ky. 858, 181 S.W.2d 457 (1944), where the mother signed her consent for adoption in the hospital and then attempted to revoke her consent and resist the adoption procedure, hold that the interest and welfare of the infant must then be considered. The right of the parent to reclaim the child is not extinguished, but the parent's superior statutory right to custody has been waived so that thereafter the court will look primarily to the child's welfare in awarding custody. *Galilean Children's Home v. Ball,* 308 Ky. 319, 214 S.W.2d 403 (1948); *Shaw v. Gra-*

*ham,* Ky., 310 S.W.2d 522 (1958); *Higgason v. Henry,* Ky., 339 S.W.2d 929 (1960).

The legal principle involved does not turn on whether the issue is adoption or custody. In *Rose v. Ledford,* 306 Ky. 662, 208 S.W.2d 957 (1948), a father was seeking to regain custody from the child's maternal grandparent. The court held that "a parent may not take (children) away from those to whom he surrendered them without first showing that it would be for the best interest of the child to do so." There is no reason, legal or factual, to distinguish this case from its predecessors simply because in this case the mother seeks to withdraw her consent to the termination of her parental rights. The principal issue in the case, as shown by the fact that the mother asserts her rights through a petition for possession and entitlement to the child, is the same issue as in *Rose v. Ledford, Lee v. Thomas,* and *Shaw v. Graham, supra.* The fact that the mother had understandable "reasons" to give up her child and "cause" to wish to regain her child does not obviate the burden on her to show that to return custody to her would be for the child's best interest. The mother must bear this burden even in the absence of proof that she is unfit in the context of the standard established by the involuntary termination statute (abandonment, neglect or abuse).

The child's Guardian Ad Litem filed a report following the initial hearing summarizing the facts that showed why this child would be much better off with the O'Neals, as opposed to being returned to Ms. Van Wey. Significantly, the Guardian Ad Litem, representing Baby Boy Van Wey, has appealed the judgment of the Court of Appeals ordering that the child be returned to its natural mother. The record is replete with reasons why the child's welfare is best served by remaining with the O'Neals. He has prospects there for a stable home environment, capable parenting, and economic and social advantages in sharp contrast to his prospects with Ms. Van Wey. We cannot overlook the fact that through no fault of anyone, neither the O'Neals nor Ms. Van Wey, the child is now two and a half years old and has been with

the O'Neals since birth. The delay results from the time necessary to try a case of this complexity, prepare the record for appeal, and go through two appellate courts. The natural bonding that had taken place in six months between the child and the O'Neals and the child's home environment was a factor considered by the trial court when he decided the case. No doubt this bonding is much greater now, some two years later.

On the other hand, the strong ties of blood and the natural love of a mother were also factors for the court to consider. They were considered. But they are not the only considerations.

The trial court concluded with obvious regret that in "cases such as this, someone is always hurt," but "a decision must be made." That the decision made by the trial court is in the best interest of the child is amply supported by the evidence.

The situation seems to create a legal paradox because the judgment terminating the mother's parental rights is entered against her consent. But this conforms to the general rule in civil cases. A plaintiff's right to dismissal is no longer absolute once the issue has been joined. At that point:

> "The matter of dismissal lies within the judicial discretion of the court. The essential question is whether the dismissal would be prejudicial to the defendant." Clay, Ky.Prac., 3rd Ed., Civil Rule 41.01.

Baby Boy Van Wey is a named defendant in the termination petition. The O'Neals were "joined as party respondents in the above-styled case on motion of the petitioner, Ms. Van Wey, by order dated May 26, 1981." These defendants all had an interest in the litigation that barred Ms. Van Wey from the right to dismiss except after appropriate consideration of prejudice to their rights. Actually, Ms. Van Wey was in a dilemma of her own, in that she wished to revoke her consent, but wished to use the same action as a vehicle to pursue her claim to possession and entitlement of the child.

Perhaps recognizing that the baby has now adapted to a new environment and new relationships is a factor mitigating against her claim, Ms. Van Wey argues that to consider such a factor in this case is unreasonable because the O'Neals were told almost immediately after they received the baby that Ms. Van Wey had changed her mind. Unfortunately, they were also told later that same night that Ms. Van Wey had once more changed her mind and would go forward with the voluntary termination the next morning. It was three months later when Ms. Van Wey filed her petition for immediate entitlement that the O'Neals first learned that custody and adoption would be contested. We see nothing in the conduct of the O'Neals that makes it inequitable to consider the baby's new environment as a factor in the decision as to the best interest of the child. In any event, the determination of this question, or indeed of this case, does not turn on the equities between these two parties, but on the paramount interest of Baby Boy Van Wey, who is not estopped by the actions of either.

In a similar vein, the conduct or misconduct, as the case may be, of attorney Brophy is not a factor critical to the decision in this case. The trial court referred to Ms. Brophy's conduct as "one final blackmark in this case, which we cannot overlook." She continued to be attorney of record for Ms. Van Wey after there was an obvious conflict with her client of which she had been notified by an attorney from the Legal Aid Society. She revealed none of this to the trial judge. It may be that present statutes permitting private placement and adoption should be given serious reconsideration by the legislature. The potential for postpartum conflict between the natural mother and the prospective adoptive parents who agree to pay the prospective mother's expenses, medical and legal, creates a situation too fraught with the possibility of abuse. The Court of Appeals' opinion strongly suggests an interest in inhibiting the private placement of children through a scheme of this nature by stating the converse of the proposition, that the court's decision is not intended to "inhibit the successful placement of children in adoptive homes ... through a legitimate child-care agency or when the child is placed in a

home subsequent to a final termination of parental rights." But the need for restrictions in private placement procedures addresses itself to the legislature. The trial court correctly looked past both the attorney's conflict of interest problems and the need for "a close look" at our adoption laws. The trial court pointed up the problem here where the law permits a nonresident, "who is in indigent circumstances and in a desperate state of need, to come to this state for the sole purpose of giving birth to a child to be adopted." The trial court correctly concluded, with obvious reluctance:

"At present, our state laws tolerate it and our Department for Human Resources grants permission for the acceptance (placement) of such children for adoption."

The placement of the child followed the procedures specified by the legislature. The petition for voluntary termination of Ms. Van Wey's parental rights did likewise. We hold with the trial court that the initial voluntary consent placed this case squarely in the category of cases holding that a parent who has transferred possession and custody of his or her child to another has surrendered the primary right of custody and thereafter the court shall determine custody on the basis of the best interest of the child. In the circumstances of this case the determination of custody and the termination of parental rights go hand in hand. They are joined together in the same legal problem and subject to the same resolution. Baby Boy Van Wey is not a piece of property. He is an important human being. When Ms. Van Wey filed her Petition for Voluntary Termination she invoked the jurisdiction of the Court of Justice to look out for the welfare of this human being.

The decision of the Court of Appeals is reversed. The final judgment of the trial court is affirmed.

AKER, LEIBSON, STEPHENSON and WINTERSHEIMER, JJ., concur.

VANCE, J., files a dissent in which STEPHENS, C.J., and GANT, J., join.

VANCE, Justice, dissenting.

This action commenced with the filing of a petition by a mother to terminate her parental rights to a child pursuant to K.R.S. 199.601. A short time after the filing of the petition for voluntary termination, the mother notified the trial judge by letter that the petition was filed under duress and that she did not wish to voluntarily terminate her parental rights. Subsequently, an amendment was filed in which the mother sought to have the immediate possession of her child restored to her. It was originally contemplated that the child, when born, would be placed for adoption. Proceedings to terminate parental rights, proceedings for immediate possession of children, and proceedings for adoption are entirely separate proceedings; however, the majority opinion discusses the issues as if the same criteria for decision were interchangeably applicable to each of them.

Thus the issue of whether a parent can dismiss or revoke a petition for voluntary termination of parental rights is decided here in the context of what the court considers to be the best interest of the child rather than the basis of whether the parent desires to voluntarily terminate parental rights.

I dissent from that portion of the opinion which approves termination of the mother's parental rights. There are two ways in which the parental rights of a parent to a child may be terminated. One is an involuntary termination, against the will of the parent, on the grounds of abandonment or continuous neglect and abuse. Such a petition may be instituted by the Cabinet for Human Resources, a licensed child caring agency, certain officers, or a parent. No such petition for involuntary termination of the parental rights of this mother was ever filed.

The other method is voluntary termination whereby a parent files a petition in circuit court asking that the parent be permitted to voluntarily terminate parental rights and stating the reason therefor. A person cannot terminate his parental rights, even voluntarily, until a judicial hearing

has established that such a voluntary termination would be in the best interest of the child and an order of termination has been entered.

The point is that such a termination is voluntary on the part of the parent. To say that a proceeding is voluntary and that the parent voluntarily relinquishes and terminates parental rights, when as here, the mother made it plain that she did not want to terminate her parental rights is contradictory on its face.

There was much testimony of threats and overreaching pressure brought to bear upon this mother which allegedly caused her to file the petition against her will. Regardless of whether the filing of the petition was voluntary or involuntary, any subsequent termination of her parental rights was not voluntary if she opposed it. A voluntary termination is one which the parent willingly pursues, is desirous of obtaining, and requests the court to approve.

The majority cites C.R. 41.01 to support a holding that the mother in this case could not as a matter of right revoke her petition to terminate her parental rights. C.R. 41.01 provides:

> Subject to the provisions of Rule 23.02, of Rule 66, and of any statute, an action, or any claim therein, may be dismissed by the plaintiff *without order of court,* by filing a notice of dismissal *at any time* before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, . . . . (Emphasis mine.)

This rule permits an unrestricted right to dismiss an action or any claim therein at any time before service of an answer by the adverse party or a motion for summary judgment.

Even if the filing of a petition to terminate parental rights be considered to be an adversary proceeding—no answer had been filed by any party when the revocation of the petition was attempted and no motion for summary judgment had been made. So it would seem that this mother had an absolute right to revoke, withdraw or dismiss her petition for voluntary termination of her parental rights. Having made it plain that she did not wish to proceed to voluntarily terminate her parental rights, it was error for the trial court to terminate those rights on the basis of the "so-called" voluntary petition.

STEPHENS, C.J., and GANT, J., join in this dissent.