LEIBSON, Justice.
In March 1981, the Attorney General, acting pursuant to KRS 271A.470, instituted proceedings against Surrogate Parenting Associates, Inc. (SPA), a Kentucky corporation, seeking to revoke SPA’s corporate charter on grounds of abuse and misuse of its corporate powers detrimental to the interest and welfare of the state and its citizens. The suit alleges that SPA’s surrogate parenting procedure is in violation of the following Kentucky statutes:
A) KRS 199.590(2), which prohibits sale, purchase or procurement for sale or purchase of “any child for the purpose of adoption”;[1]
B) KRS 199.601(2), which prohibits filing a petition for voluntary termination of parental rights “prior to five (5) days after the birth of a child”; and
C) KRS 199.500(5), which specifies that a “consent for adoption” shall not “be held valid if such consent for adoption is given prior to the fifth day after the birth of the child.”
The case was decided on the basis of a “Stipulation of Facts” setting out SPA’s manner of doing business. Franklin Circuit Court held that SPA’s activities were not illegal and not an abuse of corporate powers, and dismissed the complaint. The Court of Appeals reversed. Having accepted discretionary review, we reverse the Court of Appeals and affirm the judgment of Franklin Circuit Court.
SPA operates a medical clinic which assists infertile couples in obtaining a child biologically-related to the husband (the biological father) through artificial insemination of a “surrogate mother.” The contract for conception and delivery is between the biological father and the surrogate mother. The arrangement contemplates that after delivery of the child the parental rights of the surrogate mother will be terminated, leaving the biological father with custody. The husband of the surrogate mother, if there is one, also agrees to give up any claim to the child. The paternity of the biological father is confirmed by new methods of genetic testing with almost complete scientific certainty-
The wife of the biological father, if there is one, is not party to these contractual arrangements. Of course, after entry of a judgment terminating the parental rights of the surrogate mother, the wife of the biological father can avail herself of the legal procedure available for adoption by a stepparent. KRS 199.470(4)(a).
Before being artificially inseminated, the prospective surrogate mother agrees with the prospective father that she will voluntarily terminate all parental rights subsequent to the birth, thereby extinguishing any rights she might have to participate in any subsequent adoptive proceeding by the biological father’s wife.
The surrogate mother receives a fee from the biological father, part of which is paid before delivery of the child and the remainder of which is paid after entry of a *211 judgment terminating the parental rights of the surrogate mother. In addition, the father assumes responsibility for medical, hospital, travel, laboratory and other necessary expenses of the pregnancy.
Each party must be represented by independent counsel, and the father’s counsel is to prepare all agreements and documents in connection with the surrogate parenting process. The biological father pays the attorneys’ fees.
SPA and its president, Richard M. Levin, M.D., are paid a fee by the biological father for selection and artificial insemination of the surrogate mother, for obstetrical care and testing during pregnancy, and for actual delivery.
The circuit court held that the fact that the father’s wife might in the future adopt the child did not bring SPA’s practice within the statutory prohibition against purchasing a child for the purpose of adoption. KRS 199.590(2).[2] The circuit court reasoned that there is no requirement that the biological father be married, no assurance that his wife, if any, will subsequently adopt the child, and that any adoption by the wife would be governed by the law of the state in which the mother resides, which might not be Kentucky. It cited Baby Boy VanWey v. Christine VanWey, Ky., 656 S.W.2d 731 (1983), which holds that expansion or contraction of termination of parental rights statutes and/or adoption statutes are not matters for the courts to decide, but matters for the legislature.
The Court of Appeals reversed, deciding that the circuit court opinion rested on “an improper conceptual framework.” In its opinion the “termination of parental rights by the surrogate mother is simply a necessary predicate to a subsequent adoption by the infertile wife,” and “SPA’s procedures contravene the letter and policy underlying KRS 199.590(2) prohibiting the purchase and sale of children.”
The Court of Appeals was of the opinion that “the infertile wife of the biological father is the sine qua non of this procedure”:
“Artful draftsmanship designed to nominally include only the biological father, the surrogate, and the surrogate’s husband so as to avoid the purview of statutes such as KRS 199.590(2) must fail.”
The Court of Appeals concludes that its decision to prohibit the surrogate parenting procedure does not “legislate from the bench,” because “the legislature has spoken.”
The question for us to decide is one of statutory interpretation: Has the legislature spoken? The fundamental question is whether SPA’s involvement in the surrogate parenting procedure should be construed as participation in the buying and selling of babies as prohibited by KRS 199.-590(2). We conclude that it does not, that there are fundamental differences between the surrogate parenting procedure in which SPA participates and the buying and selling of children as prohibited by KRS 199.-590(2) which place this surrogate parenting • procedure beyond the purview of present legislation.
There is no doubt but that KRS 199.590 is intended to keep baby brokers from overwhelming an expectant mother or the parents of a child with financial inducements to part with the child. But the central fact in the surrogate parenting procedure is that the agreement to bear the child is entered into before conception. The essential considerations for the surrogate mother when she agrees to the surrogate parenting procedure are not avoiding the consequences of an unwanted pregnancy or fear of the financial burden of child rearing. On the contrary, the essential consideration is to assist a person or couple who *212 desperately want a child but are unable to conceive one in the customary manner to achieve a biologically related offspring. The problem is caused by the wife’s infertility. The problem is solved by artificial insemination. The process is not biologically different from the reverse situation where the husband is infertile and the wife conceives by artificial insemination.
No one suggests that where the husband is infertile and conception is induced by artificial insemination of the wife that the participants involved, the biological father, the physicians who care for the mother and deliver the child, or the attorneys who arranged the procedure, have violated the statutes now in place. Although this is tampering with nature in the same manner as the surrogate parenting procedure here involved, we recognize “[t]he decision whether or not to beget or bear a child is at the very heart ... of constitutionally protected choices.” Carey v. Population Services, Int’l, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).
When KRS 199.590 was amended in 1984 the following language was added:
“Nothing in this section shall be construed to prohibit in vitro fertilization. For purposes of this section ‘in vitro fertilization’ means the process whereby an egg is removed from a woman, then fertilized in a receptacle by the sperm of the husband of the woman in whose womb the fertilized egg will thereafter be implanted.”[3]
The Attorney General contends that by including this “in vitro” fertilization procedure in the statute while leaving out the surrogate parenting procedure presently under consideration, the legislature was legislating against surrogate parenting. We do not divine any such hidden meanings. All we can derive from this language is that the legislature has expressed itself about one procedure for medically assisted conception while remaining silent on others. To this extent the legislature puts its stamp of approval on tampering with nature in the interest of assisting a childless couple to conceive. The “in vitro” fertilization procedure sanctioned by the statute and the surrogate parenting procedure as described in the Stipulation of Facts are similar in that both enable a childless couple to have a baby biologically related to one of them when they could not do so otherwise. The fact that the statute now expressly sanctions one way of doing this does not rule out other ways by implication. In an area so fundamental as medically assisting a childless couple to have a child, such a prohibition should not be implied.
As stated in the circuit court opinion: “Because of the existence of a legal relationship between the father and the child, any dealing between the father and the surrogate mother in regard to the child cannot properly be characterized as an adoption.”
As between the biological father, who is both contractually acknowledged and scientifically confirmed, and the biological mother, if there is no subsequent termination of the mother’s parental rights, the only legal question between the parties would relate to which biological parent should have custody. KRS 403.270 prepares for a resolution of this dilemma by stating:
“The court shall determine custody in accordance with the best interest of the child and equal consideration shall be given to each parent.”
SPA has freely acknowledged that the initial contractual arrangements regarding the mother’s surrender of custody and termination of parental rights are voidable. The surrogate mother’s consent given before five days following birth of the baby is no more legally binding than the decision of an unwed mother during her pregnancy *213 that she will put her baby up for adoption. The five days’ consent feature in the termination of parental rights statute (KRS 199.-601(2)) and in the consent to adoption statute (KRS 199.500(5)) take precedence over the parties’ contractual commitments, meaning that the surrogate mother is free to change her mind. The policy of the voluntary termination statute and the consent to adoption statute is to preserve to the mother her right of choice regardless of decisions made before the birth of the child. This policy is not violated by the existence of the contractual arrangements previously made. The policy of these statutes is carried out because the law gives the mother the opportunity to reconsider her decision to fulfill the role as surrogate mother and refuse to perform the voluntary termination procedure. Should she elect to do so, the situation would be no different than had she never entered into the procedure. She would be in the same position vis-a-vis the child and the biological father as any other mother with a child born out of wedlock. The parental rights and obligations between the biological father and mother, and the obligations they owe to the child, would then be the rights and obligations imposed by pertinent statutes rather than the obligations imposed by the contract now vitiated.
Kentucky has taken the position that custody contracts are voidable, not illegal and void. In Edleson v. Edleson, 179 Ky. 300, 200 S.W. 625 (1918), we held that, while the court is not compelled to enforce such a contract because the statutory rights are preemptive, such a contract is not per se illegal. The surrogate mother who changes her mind before going through with her contractual obligation stands in the same legal position as a woman who conceives without benefit of contractual obligations. She has forfeited her rights to whatever fees the contract provided, but both the mother, child and biological father now have the statutory rights and obligations as exist in the absence of contract.
The advances of biomedical science have carried us forward, willingly or otherwise into a new era of genetics.
If there are social and ethical problems in the solutions science offers, these are problems of public policy that belong in the legislative domain, not in the judicial, under our constitutional doctrine of separation of powers. Ky. Const., Sections 27 and 28. It is only when a proposed solution violates individual constitutional rights that the courts have a place in the controversy.
But that is not the question here because the threshold question is whether the legislation on the books declares the procedure impermissible. Short of such legislation it is not for the courts to cut off solutions offered by science.
In Bedinger v. Graybill’s Executor & Trustee, Ky., 302 S.W.2d 594 (1957), we considered and rejected a request that the court, under the guise of legislative “interpretation,” hold that an adoption by a husband of his wife, making her his heir at law, violated Kentucky “public policy” notwithstanding statutory language which addressed the subject and failed to forbid the arrangement challenged. We stated:
“The courts are bound by statutory law as written and cannot write into it an exception that the legislature did not make.” 302 S.W.2d at 599.
We have consistently held that our Kentucky Constitution empowers the legislative branch, but not the judicial branch, of government to articulate public policy regarding health and welfare. Wooden v. Goheen, Ky., 255 S.W.2d 1000 (1953) and Walters v. Bindner, Ky., 435 S.W.2d 464 (1968). The questions of whether and how new medical services of the type offered by SPA offend public policy and should be prohibited by legislation are addressed to the legislature, not the courts.
The courts should not shrink from the benefits to be derived from science in solving these problems simply because they may lead to legal complications. The legal complications are not insolvable. Indeed, we have no reason to believe that the sur *214 rogate parenting procedure in which SPA participates will not, in most instances, proceed routinely to the conclusion desired by all of the parties at the outset — a woman who can bear children assisting a childless couple to fulfill their desire for a biologically-related child.
We agree with the trial court that if there is a judgment to be made outlawing such a procedure, it is a matter for the legislature. The surrogate parenting procedure as outlined in the Stipulation of Facts is not foreclosed by legislation now on the books. The judgment of the Court of Appeals is reversed. The judgment of the trial court is affirmed.
STEPHENS, C.J., and AKER, GANT and LEIBSON, JJ., concur.
STEPHENSON, J., concurs in results only.
VANCE and WINTERSHEIMER, JJ., dissent by separate opinions.

. This statute was changed to this present form in 1984. Since the question to be answered turns on whether the services being offered by the corporation are illegal, the issue must be decided on the current state of the law.

. KRS 199.590(2) as amended in 1984 prohibits "purchase of any child for the purpose of adoption or any other purpose, including termination of parental rights.” The change in wording to include purchase of a child for the purpose of termination of parental rights does not render the nature of the services conducted by SPA illegal for reasons which will be covered later in this opinion.

. Presumably, in this procedure a husband and wife bear a child utilizing an egg taken from another woman, fertilized by the husband, and then implanted in the womb of the wife. Donor “in vitro fertilization” differs from SPA’s procedure only in who carries the fertilized egg. Donor "in vitro fertilization” and "surrogate parenting" are virtually indistinguishable from the standpoint of biological engineering.