Lois Lynnette BOATWRIGHT, natural mother of Joshua Boatwright, a minor child, Appellant,

v.

Jackie Lee WALKER, Joshua Lee Boatwright, a minor; and Brent Craig Wallace, natural father of Joshua Lee Boatwright, Appellees,

and

Jackie Lee WALKER, Appellant,

v.

Joshua Lee BOATWRIGHT, a minor, Lois Lynnette Boatwright and Brent Craig Wallace, Appellees.

Court of Appeals of Kentucky.

May 16, 1986.

Discretionary Review Denied and Opinion Ordered Published by Supreme Court Aug. 26, 1986.

Thomas L. Gilmore, Paducah, Bill Flynn, Paducah, for Lois Lynnette Boatwright.

Michael R. Murphy, Paducah, for Jackie Lee Walker.

Before CLAYTON, DUNN and McDONALD, JJ.

McDONALD, Judge.

This is a combined appeal from an amended judgment of the Livingston Circuit Court which denied the petition of Jackie Lee Walker to adopt Joshua Lee Boatwright, the illegitimate infant son of Lois Lynnette Boatwright, and changing custody of Joshua from the natural mother, Boatwright, to the appellant petitioner, Walker. On appeal, Walker argues that the court erred in failing to find that Lois knowingly executed a written consent to adopt without being influenced by fraud, duress or other incapacity. In her appeal Lois first asks whether sufficient cause to revoke her written consent to the adoption was shown and, second, whether substantial evidence supports the circuit court's finding that she is unfit to have custody of her infant son.

On July 27, 1984, Walker and his wife, Rita, petitioned the trial court to adopt Joshua, born to Lois Boatwright and Brent Wallace on July 28, 1983, in Paducah, Kentucky.[1] Appended to the petition were two notarized separate "CONSENT TO ADOPT" forms signed individually by the natural mother and natural father as of March 8, 1984. On August 27, 1984, after the appointment and answer of the guardian ad litem had been filed recommending adoption, Lois, acting in her own behalf, filed an answer alleging that she desired to reverse her prior consent to the Walkers' adoption of Joshua. As grounds therefor she maintained that at the time the consent was executed she was led by the Walkers, her close friends, to believe that she would be allowed to continue a meaningful relationship with her son. She also alleged they exerted fraud and undue influence over her at a time when she had no financial resources to raise her son. She requested that her parental rights not be terminated and that physical custody of the child be returned to her. The child's natural father, Brent Wallace, filed an entry of appearance waiving service, notice and jurisdiction and stating his desire not to file responsive pleadings.

On September 6, 1984, a confidential report of the Cabinet for Human Resources was prepared by Gwendolyn Lee and filed,

---

**1.** Rita Walker is not a party to this appeal as she died following the commencement of this action.

recommending adoption. On January 31, 1985, Lois, now with the assistance of counsel, filed a motion for immediate possession and a supporting affidavit alleging in essence the same grounds put forward in her answer. A second set of confidential reports was then filed by the cabinet which, as before, recommended that the petition for adoption be granted. At the time these reports were filed, Lois had separated from the natural father, Brent Wallace, and was living in Paducah and looking for employment.

An extensive evidentiary hearing was held on March 28, 1985. As a complete summation of the 300 pages of transcript would be unduly burdensome, if not impossible, we shall confine ourselves to a recitation of the key testimony of the material witnesses.

Jackie Lee Walker, a 37-year-old towboat captain, denied that he or his wife had ever misrepresented their intentions to permit Lois to visit her son following adoption or placing him in their custody. Instead, Walker maintained that Lois had been permitted to visit with the child at her discretion for most of the time during the action except for a six-week period when, acting upon the advice of a social worker, Ms. Lee, the Walkers had denied her visitation. As for future visitation, Walker indicated his willingness to permit Lois to continue visitation with the court's approval following adoption, the only restriction being that she not inform the child that she is his natural mother.

Walker further explained that Lois had, in early 1984, rented a trailer from the Walkers after leaving the child's father. After several months Lois allegedly brought the infant child to the Walkers requesting that they adopt him as his father had threatened to take him. The three were then advised by an attorney as to the ramifications of adoption. Prior to the transfer of physical custody in February, 1984, the Walkers kept the child in their home approximately three or four days a week. Walker testified that every time the couple went to visit the child at Lois's home, the child was dirty, was wearing smelly, vomit-covered diapers and was extremely nervous.

Brent Wallace, the child's father, testified that Lois "didn't know what to do for the child whenever he was in need," and noted that when frustrated she would scream and holler at him and lose her temper. Other witnesses, including friends and relatives of the parties, verified the testimony of Lois's lack of parenting skills and use of inappropriate discipline. As for the circumstances under which the consent was signed, Brent recalled that he, Lois and Mrs. Walker had met at an attorney's office for approximately an hour and a half at which time termination of rights was thoroughly explained.

Child psychologist Bruce Amble testified that based upon his observations of the child and Walker together, and certain tests administered to Walker, the child's best interest dictated that he remain in a stable environment with Walker.

Lois Boatwright, 21 years old, testified that she had been recently employed at the Paducah Country Club as a cleaning person. She admitted that she, Mrs. Walker and Brent had talked with an attorney about adoption and about the Walkers' promise to permit her to visit her child. Lois admitted that she had understood most of what was said. As to allegations of her improper discipline of the child, Lois maintained that she never hit the child "overly hard," her discipline being more in the nature of a smack on the hand occasionally. In contrast to Walker's version of events, Lois recalled that Walker had initially inquired about adopting Joshua. Lois had requested that the couple take care of the child, but only while she checked on state aid. She alleged the couple refused, however, to take the child unless they could formally adopt him as their medical insurance would not otherwise cover his medical expenses. She believed at that time that adoption was the only option as Joshua was very sick and she had no money to pay his medical bills. Questioned as to her frame of mind, Lois admitted that

it was not very good at that time and that she had felt pressured. As for her life recently, Lois related she had made substantial progress as evidenced by her independence and financial self-reliance. Her family was allegedly much more supportive, too, due to their awareness that Lois was taking charge of her life. Lois denied ever having used strong language with regard to the baby or inappropriately disciplining him.

Others, including Ann Boatwright, Lois's grandmother, Patricia Dykes, Lois's aunt, Linda Turner, Lois's mother, Mary Ann Halicks, a Paducah attorney and former social worker with the cabinet, and Edna Kuehle, a licensed social worker, testified that Lois was a good mother, that Joshua appeared well cared for and that the best interests of the child would be served by returning him to his natural mother.

Finally testifying was Sybil Bell, Lois's counselor, a licensed clinical social worker. Bell first saw Lois on March 7, 1984, the day before Lois gave her sworn consent to the adoption. At that time, she described Lois as being depressed and confused. Bell was told by Lois that her baby had serious stomach problems and needed medical care which she could not afford to provide. Bell denies advising Lois that she should sign the adoption papers but does recall that she urged Lois to seek counsel and to have put in writing anything that was verbally said. In reference to explaining the adoption to Lois on March 7, 1984, Bell testified:

A. I explained to her that she would need to get legal counsel and they—she would need to be very careful on that. I remember me saying that to her, and I questioned and questioned and questioned, "think, think, think about this."

On April 3, 1985, Judge Paxton entered an order finding, first, that Lois had "during the pleadings withdrawn her consent to adoption of this child." The trial court then concluded that under *Van Wey v. Van Wey*, Ky., 656 S.W.2d 731 (1983), the best interests of the child must next be determined. Numerous adverse considerations regarding the natural mother were then specifically found. Following those findings the trial court ordered that custody of the child be transferred to Jackie Lee Walker and that the parental rights of the mother not be terminated "at this point." Visitation at reasonable times and places was then ordered. A report of the guardian ad litem was then filed, concluding that no evidence of fraud, duress or undue influence was to be found in the record or testimony of the hearing, that Lois's consent was informed and carefully considered by her and believed to be in the best interest of the child at the time given, and that it would be in the best interest of the child for adoption to be allowed.

On April 10, 1985, Jackie Lee Walker, by counsel, moved to alter, amend or vacate the judgment based upon confusion as to the finality of the order with regard to termination of Lois's parental rights and the granting of the adoption, and further confusion as to the standard to be applied in the custody decision, the "best interest of the child" standard of *Van Wey, supra,* or the unfitness of the natural parent test of *McNames v. Corum*, Ky., 683 S.W.2d 246 (1985). Petitioner additionally questioned the finding with respect to Lois's withdrawal of the consent to the adoption. Lois also moved to alter, amend or vacate, and for more specific findings as to her circumstances at the time of consent.

On July 19, 1985, the trial court, apparently relying on the *McNames* standard, entered an order finding Lois to be unfit to have custody of her child. The petition for adoption was then denied and Walker was granted custody, with visitation to be determined by the parties. Separate appeals were then taken to this court.

We have thoroughly reviewed the record, the procedural history of the controversy, and the testimony of the various parties. Cases such as this are always difficult for the courts as well as the parties. Our efforts in this matter have been in accordance with our view of the importance of adoption and child custody disputes. Based upon those efforts, we conclude that

this appeal contains three major questions. First, what type of disability, physical, mental, emotional or financial, must a consenting biological parent suffer in order to be said to have sufficient reason to revoke his or her consent to the adoption of his child? Second, did Lois present sufficient evidence to withdraw her consent? And finally, if a biological parent can be said to have properly revoked his or her consent, what legal standard is applicable to determine the custody of the child, that is, the "best interest of the child" standard set forth in *Van Wey v. Van Wey*, or the unfitness test of *McNames v. Corum, supra?*

Lois contends, contrary to Walker's arguments, that sufficient reason includes such factors as the following: temporary distress or discouragement, *Warner v. Ward*, Ky., 401 S.W.2d 62 (1966); remarriage, establishment of a home, employment, sufficient means of support, *Hill v. Poole*, Ky., 493 S.W.2d 482 (1973); and poverty, despair, and depression, *McNames*. We do not seriously dispute the conclusions Lois attempts to make with regard to the various opinions cited immediately above. However, by way of clarification, we note that the turning point in *Warner, supra*, was more directly the minority of the consenting natural mother and the failure of the adoptive parents to properly join the child's natural father in their petition to adopt. *Id.* at 63–4. The decision's reference to temporary distress or discouragement is, in our view, more in the nature of a passing reference than a critical factor. As for *Hill, supra*, the court in that case appears to have focused on the failure of the natural father to execute the written consent to adoption under oath as invalidating the consent. *Id.* at 484. While the court does discuss the issue of valid withdrawal of consent, it prefaces its discussion with the comment that the question has been rendered moot by the invalid consent. As for that discussion, it is composed of two sentences of dicta, one of which is rhetorical and neither of which cites any judicial authority holding that remarriage, establishment of a home, employ-

ment, or sufficient means of support is sufficient reason under the law to withdraw consent. Finally, as to *McNames* and its alleged reliance on poverty, dispair and depression, the decision makes but one reference to these elements, and then only in the statement of the facts. The crux of *McNames*, in our view, rests upon its requirement that in the absence of an "agreement of a permanent nature," a showing of unfitness of the natural parent(s) must be made before a nonparent may be awarded custody of the natural parent's child.

■ However, for the sake of argument, we shall assume that *Wagner, Hill*, and *McNames*, hold as appellant Lois Boatwright interprets them to hold, at least as to the grounds adequate to constitute sufficient reason. Even if this were so, a cursory reading of *Van Wey* reveals that these asserted sufficient reasons are no longer adequate to withdraw consent, if indeed they were ever adequate to begin with. Speaking directly to this issue, our state's Supreme Court, in *Van Wey*, stated:

"Sufficient reason" means more than emotional distress at the time the petition for voluntary termination is filed. In the cases cited denying adoption when a mother revokes consent for "sufficient cause," there were elements of coercion or deception or the mother was not legally able to give consent. *Skaggs v. Gannon*, 293 Ky. 795, 170 S.W.2d 12 (1943); *Warner v. Ward*, Ky., 401 S.W.2d 62 (1966). Mother love alone would be sufficient reason to seek to revoke one's consent if "sufficient reason" had no limitations.

This same requirement, that fraud or duress be proven in addition to any other disabilities, can be seen not only in *Van Wey* but in earlier decisions as well. *See Lee v. Thomas*, 297 Ky. 858, 181 S.W.2d 457 (1944), and *Keeling v. Minton*, 339 S.W.2d 464 (1960).

Were courts to permit natural parents to withdraw their consent to the adoption of their child based simply upon temporary depression, discouragement or poverty, an

otherwise valid consent would be meaningless as such conditions normally accompany or create situations such as those now before us. Affording natural parents the advantage of easily voiding their consent agreements would in turn result in the disruption of the lives of innocent third-party infants like Joshua who, years after being placed with adoptive parents, could be removed, almost at whim, much to their own depression, discouragement and poverty, we would imagine. In effect, then, the requirement that fraud or duress be proven to exist at the time of consent in order to effect its withdrawal is simply the court's way of telling natural parents to, as Sybil Bell told Lois, "think, think, think about this" before they execute a valid consent to an adoption or commence proceeding to voluntarily terminate their parental rights. Once that consent has been freely and knowingly given, mere depression, discouragement or poverty alone will not be sufficient to undo what has been done.

■■■■ This being the rule, we now address the question of whether Lois presented sufficient evidence of fraud or duress to effectively withdraw her consent. At best, the only indication of any alleged fraud is the supposed refusal of the Walkers to permit Lois to visit Joshua following his transfer to them. We note first that this allegation is at least in part refuted by the testimony of Walker who indicated that Lois was permitted visitation except for a short six-week period. Even during this period, Walker indicates that his wife permitted Lois to visit the child at a local shopping mall. As the parties are well aware, actual fraud, as opposed to constructive fraud, consists in successful deception intentionally practiced to induce another to part with property or some legal right. *Combs v. Poulos*, 241 Ky. 617, 44 S.W.2d 571 (1932). In other words, there must be some material misrepresentation made with the knowledge that it was false and with the intent that it be acted upon. *Miles v. Proffitt*, Ky., 266 S.W.2d 333 (1954). The facts of the present appeal simply do not support such a conclusion. To the contrary, the record reveals that all parties have acted in a straightforward manner doing only what they thought best for the child at the time.

■■■■ Fraud having been ruled out, we next turn to the element of duress. As before, we can find very little evidence of circumstances constituting duress in its traditional sense. At best, the record demonstrates that at the time Joshua was surrendered and the consent executed, Lois was impoverished and depressed, and her baby was ill. While these circumstances may tend to make one more susceptible to duress, of themselves they are insufficient to constitute civil duress. For actionable civil duress to have occurred, there must be "an actual or threatened violation or restraint on a man's person, contrary to law, to compel him to enter into a contract or to discharge one." *Bond State Bank v. Vaughn*, 241 Ky. 524, 44 S.W.2d 527, 528 (1931), (citing *Fratello v. Fratello*, 118 Misc. 584, 193 N.Y.S. 865 (1922)). Nothing in the record indicates that Lois was threatened or compelled by the Walkers to give her consent to the adoption. Again, to the contrary, the record indicates that prior to executing the consent Lois was advised as to the legal ramifications of her actions by Judge Graves and the Walkers' attorney. She additionally had further discussions with other professionals, all of whom counseled restraint. We find it very difficult, given the involvement of all the above individuals, to find any evidence of duress.

■■■ The trial court's finding with respect to the withdrawal of her consent is ambiguous. As noted earlier, the April 3, 1985 judgment states only that Lois had "during the pleadings withdrawn her consent to adoption of this child." As appellant Walker points out, it is difficult to determine whether this brief statement is a legal conclusion or simply a historical reference to Lois's attempt to retract her consent. If it is intended as a legal conclusion, then it is erroneous. If it is merely a comment upon procedural history, then it is incomplete. In either respect, it is erroneous. No evidence sufficient to constitute

"sufficient reason" to withdraw consent is to be found in this record.

Having determined that the trial court erred as a matter of law in its conclusion that Lois had withdrawn her consent, we begin our discussion of the standard to be applied in determining custody of Joshua. Lois maintains that prior to changing custody of her child to a nonparent she must be determined to be unfit by clear and convincing evidence, the standard involved in involuntary termination of parental rights cases. *McNames*, at 247. Walker, on the other hand, maintains that the best interest of the child standard enunciated in *Van Wey*, at 735, controls when consent to adoption has not been withdrawn. As for the court below, it apparently began by applying the best interests standard in its April, 1985 judgment, but later changed to the unfitness test of *McNames* in its July 19, 1985 order modifying the earlier judgment.

We are not surprised by the parties' uncertainty as to which standard is to be applied in situations such as this one. The law with respect to private adoptions and voluntary terminations has long been a source of confusion for both the bar and the bench. *See Chandler v. Chandler*, Ky., 535 S.W.2d 71 (1975), which comments on that existing confusion. Moreover, we can easily see how a reading of both *Van Wey* and *McNames*, especially the dicta contained therein, might lend itself to an application of either decision to the present fact situation. For example, the earlier opinion, *Van Wey*, directly involves the attempted withdrawal of a voluntary petition to terminate parental rights. Though the majority expressly holds there to be no distinction between adoption or custody, the issue is clouded by the dissent of three judges who specifically recognize such a distinction. As for *McNames*, the court notes that it falls within the classic fact pattern of private adoptions, but adds that the adoption portion of the litigation was earlier dismissed below as being untimely, thus leaving only the custody issue in dispute. As a further distinction, the court in *McNames* notes that the evidence before it did not justify a holding that the natural mother involved, Phyllis Corum, had entered into an agreement of a permanent nature that the appellants should have custody of her child. *Id.* at 247.

■ Given the broad language of *Van Wey* and *McNames*, it is apparent that meritorious arguments could be made in support of applying either. However, upon review of each opinion and the authorities cited therein, we conclude that the best interest of the child standard of *Van Wey* applies in the case before us.

■ In our opinion, the critical distinction rendering *McNames* noncontrolling, besides the dismissal of the adoption proceeding, is the absence of "an agreement of a permanent nature" such as the consent to adopt papers voluntarily executed by Lois. Absent such an agreement, the natural parents of a child have a statutorily granted superior right to its care and custody. KRS 405.020; *Van Wey*, at 735. This right may only be abrogated in an action involving a nonparent seeking custody by a showing of unfitness sufficient to support an involuntary termination of parental rights. *See McNames*, at 247. *See also Bond v. Shepard*, Ky., 509 S.W.2d 528, 529 (1974); *James v. James*, Ky., 457 S.W.2d 261, 263 (1970). As both *James, supra*, and *Bond, supra*, point out, however, this superior right may be contracted away. *Bond*, at 529; *James*, at 263. Once such a contract has been executed, the natural parent has waived its superior right, and the best interests of the child take precedence as provided for in *Van Wey*, at 735.

■ Looking to the evidence presented below, we believe the record repeatedly demonstrates that it is in Joshua's best interest that his custody, both physical and legal, be awarded to and continued in Jackie Lee Walker. Expert testimony from psychologist Bruce Amble, Ph.D., indicates that Joshua, now almost three years old, is well integrated in the Walker household and that to remove him would be extremely disruptive. The Walkers have a large brick

home and Jackie Lee earns a comfortable living as a riverboat captain. Lois, on the other hand, is employed at a near minimum wage job while sharing an apartment with another woman and that woman's boyfriend. While she appears to have matured considerably since placing Joshua in the Walkers' care, the harsh reality is that her care for and treatment of Joshua prior to that time was totally unacceptable. Coupling these factors with Lois's own difficult childhood convinces us that the evidence is clear that the best interests of Joshua will be served by his adoption by appellant Walker. Therefore, we conclude that the circuit court was inerrant in its application of the best interests test mentioned in the April 3, 1985 judgment, but erring in its determination that Lois had withdrawn her consent. As consent was not legally withdrawn and the best interests of Joshua require his custody to be awarded to Walker, the trial court erred in refusing to grant the adoption. As for the trial court's later finding that Lois was unfit, it is simply irrelevant even though a strong argument can be made that it is supported by substantial evidence.

The judgment of the Livingston Circuit Court is reversed and remanded as to that portion denying Walker's petition to adopt and affirmed as to that part continuing custody in Walker.

Further, pursuant to 2(a) of the order designating the case as a special appeal, the application of CR 76.20, CR 76.32 and other appropriate rules of civil procedure for further appellate steps is reinstated effective the date of this opinion.

All concur.