Ortha SHIFFLET, Appellant,

v.

Ginger Carol SHIFFLET, Appellee.

No. 93–SC–888–DG.

Supreme Court of Kentucky.

Jan. 19, 1995.

Michael L. Judy, Richard M. Guarnieri, Frankfort, for appellant.

Ginger Carol Shifflet, pro se.

LEIBSON, Justice.

This dispute involves deciding custody of Robin Shifflet, born November 18, 1981, between Robin's mother, Ginger Shifflet, and her paternal grandmother, Ortha Shifflet. The trial court awarded custody to the grandmother, using the "best interests of the child" standard. The Court of Appeals reversed with directions to enter judgment for the mother, citing law "that in a custody dispute between a parent and a non-parent, the parent will prevail unless it is shown by clear and convincing evidence that the parent is unfit." For reasons to be stated, we reverse the decision of the Court of Appeals, but we do not reinstate the decree. We remand to the trial court to retry the custody

issue. The principles that control deciding the issue between the parties are set out in a similar case, *Greathouse v. Shreve*, 891 S.W.2d 387, which will have the same rendition date as this opinion.

As stated, Robin Shifflet was born in 1981 to appellee, Ginger Carol Shifflet, and to Robert Shifflet, the son of appellant, Ortha Shifflet. The trial court's "Order" recites:

"Although there is some dispute among the parties concerning when Robin was delivered into the custody of Ortha, the facts show that since Robin was a baby she has spent the vast majority of her life in the custody of Ortha. After her birth in November of 1981, Ortha took Robin into her home along with Ginger's other children when Ginger was incarcerated in April of 1982 for shoplifting. This began a long series of incarcerations which predominated in Ginger's life until 1989. . . .

The evidence is also compelling that since 1989, Ginger has 'changed her life'. She now lives with a man named Richard Peck who is by all accounts a law-abiding, steadily employed, responsible person. She and Richard Peck live now in Danville, Illinois, where Ginger is also employed at a nursing home. They live with Ginger's daughter from a prior relationship and Mr. Peck's son from another marriage."

The trial court's Order further reflects that the father, Robert, "has a long criminal history including allegations of sexual abuse of a child." He is not a party seeking custody in this case, and "Ortha testified that she does not allow Robin to visit with her father overnight," although the record further reflects that a social worker, Gail Combs, reported that Robin had spent the weekend with her father in the recent past and reported unsupervised visits. It should be noted that Ortha, while found appropriate to the award of custody, has in the past pled guilty to shoplifting, and has a daughter who may be involved in the care of the child who has, in the past, been arrested on multiple occasions for shoplifting and alcohol intoxication. Although the trial court awarded custody to Ortha, the paternal grandmother, and there is ample evidence to support the trial court's finding that such award was in the best interest of the child, primarily because the child appeared to have been well taken care of in Ortha's home for almost ten years at the time of trial, custody with the 61–year old grandmother is arguably less than an ideal situation.

■ The trial court rested its authority to use the best interests of the child standard in KRS 403.340(2) in deciding custody, rather than recognizing the superior right of the parent (KRS 405.020), on the fact that when Ginger and Robert were divorced in 1985, by agreement the decree of dissolution granted "temporary custody of Robin . . . to Ortha Shifflet, the mother of Robert." The trial court stated KRS 403.340(2) "defines the standards to be apply when a modification of a decree concerning a custody order is to be considered." The Court of Appeals is entirely correct that "the trial court erred as a matter of law in its application of KRS 403.340(2)." The Court of Appeals stated, and we agree:

"Clearly the standards set forth in this statute are intended to apply only to modifications of permanent awards of custody."

Further, and no doubt because these standards apply only to modification of a permanent custody decree, KRS 403.340 does not simply apply a "best interests of the child" standard; it specifies doing so only upon proof "the child's present environment may endanger seriously his physical, mental, moral or emotional health" (KRS 403.340(1)), or proof "the custodian agrees to the modification" (KRS 403.340(2)(a)), or proof "the child has been integrated into the family of the petitioner with the consent of the custodian" (KRS 403.340(2)(b)). None of the preconditions to modifying a custody decree "to serve the best interests of the child," as stated in KRS 403.340, apply here. The "best interests of the child" standard is set out in KRS 403.270, and applies to a custody dispute *between parents:* "the court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent."

However, although we agree with the Court of Appeals that the trial court erred in applying the law to this case, nevertheless we

reverse and remand the Court of Appeals because we are in partial agreement with the dissenting opinion of Judge Emberton. Judge Emberton opines that "under certain circumstances, the parent should be estopped from asserting her superior right to custody." Judge Emberton characterizes the principle at work as "equitable estoppel," and states:

> "When a parent relinquishes control of a child to a non-parent, the care and support furnished may be for such a length of time and under such circumstances as to estop the parent from denying that she has forfeited her natural right to custody of the child."

 We do not agree that the principle at work here is one of estoppel, but we do agree that there is a closely related principle that must be considered. The evidence raises a question of waiver: did the actions of Ginger Shifflet amount to an intentional and voluntary waiver of her superior right as a parent to the custody of her child, Robin? If so, the trial court would be justified in applying the best interests of the child standard in deciding custody between Ginger and Ortha, the paternal grandmother. As we state in *Greathouse v. Shreve, supra:*

> "Waiver differs from estoppel primarily because it does not require proof of the other party having been misled. 'Waiver is essentially unilateral, resulting as a legal consequence from some act or conduct of [the] party against whom it operates, and no act of [the] party in whose favor it is made is necessary to complete it.'" *See Greathouse,* at 390 (citations omitted).

Further, as we stated in *Greathouse:*

> "What evidence constitutes proof a parent, who is not proved unsuited to the trust (KRS 405.020(1)), has waived his or her superior custodial right when that right is challenged by a non-parent? As we stated above, waiver requires proof of a 'knowing and voluntary surrender or relinquishment of a known right.' Because this is a right with both constitutional and statutory underpinnings, proof of waiver must be clear and convincing. As such, while no formal or written waiver is required, state-

ments and supporting circumstances must be equivalent to an express waiver to meet the burden of proof." *Id.,* at 391.

The parent's superior right of custody is not lost to a non-parent, including a grandparent, simply because a child is left in the care of the non-parent for a considerable length of time. As we state in *Greathouse:*

> "Thus, the first question here is whether, considering the totality of the evidence, [the parent] engaged in a knowing and voluntary relinquishment of [her] superior right of custody, to which [she] was entitled unless unsuited to the trust. If [she] did so, the next question here is whether, in present circumstances, [the parent] or [grandparent] should be awarded custody in the best interests of the child." *Id.,* at 391.

Thus we reverse the Court of Appeals' decision without affirming the trial court's decree. We remand this case to the trial court for further consideration and decision consistent with this opinion.

STEPHENS, C.J., and LAMBERT, REYNOLDS and STUMBO, JJ., concur.

SPAIN, J., concurs by separate opinion in which WINTERSHEIMER, J., joins.

SPAIN, Justice, concurring in result.

Although I concur in the result reached by the Majority in reversing the decision of the Court of Appeals and in remanding the matter to the trial court for further findings and consideration, I write separately to express my views regarding this custody dispute.

First of all, a careful review of the specific facts is absolutely essential in any disputed child custody case, and is particularly so in this case.

The subject of this custody dispute, Robin Shifflet, now thirteen years old, was given a home in April of 1982 when she was only five months old, by her paternal grandmother, Ortha Shifflet, a widow. At that time, Robin's mother, Ginger, was jailed for shoplifting, so Ortha took Robin and two of Ginger's children by different fathers, into her home

to care for them. Ginger freely and voluntarily agreed for Ortha to have Robin's care and control, and even agreed that an order should be entered in the Franklin District Court granting Ortha legal guardianship of Robin.

After Ginger's release from being jailed in April, she was twice arrested in August of 1982 for theft, and in the following month was arrested for the felony of receiving stolen property and sentenced to two years in the state penitentiary. While on probation from that sentence in February 1983, she was again arrested for misdemeanor theft and sentenced to jail for sixty days. Again while on probation in October 1983, she was arrested for the felony of receiving stolen property and sentenced to a year in the penitentiary. Furthermore, her probation was revoked and she was ordered to serve the previous two-year felony sentence.

While she was in the penitentiary early in 1985, Ginger brought an action in Franklin Circuit Court to dissolve her marriage to Robert Shifflet, who at the time was also incarcerated. Ortha intervened in the action and, by agreement, was awarded temporary custody of Robin in the Decree of Dissolution entered on March 19, 1985.

Ginger was paroled in July of 1985, but was again arrested in February of 1986, convicted, and had her felony parole revoked, whereupon she was returned to the state penitentiary. She was again paroled on July 31, 1986, but following arrests in August, September, and October, her parole was revoked for a second time. Following her release in September 1987, she was again arrested in November for receiving stolen property valued over $100, was convicted, and was sentenced to two years in prison. She served that sentence and was released in June of 1989.

The evidence before the trial court on its hearing of Ginger's 1991 motion to award her permanent custody of Robin, reflected without dispute that during her periods of freedom between serving jail time and penitentiary sentences, Ginger maintained an irresponsible, immoral, and criminal lifestyle, with little contact with Robin and her other children. There was considerable evidence that during the times when one or more of Ginger's three older children were in her actual custody, and while Robin was with Ortha, they were exposed to her use of marijuana and a live-in male friend's habitual intravenous drug use. One of her live-in boyfriends gave her then-eight-year-old son marijuana to smoke and alcohol to drink. Ginger's older daughter was left in the care of a live-in boyfriend's thirteen-year-old son, who sexually molested the little girl. Ginger herself has hit her children in the face and kicked her son as punishment.

Ginger now lives with a boyfriend in Danville, Illinois. Living with them are Ginger's older daughter, who is now approximately fourteen years old, and the boyfriend's seventeen- or eighteen-year-old son.

Notwithstanding all the above-referred-to evidence of Ginger's troubled past, the trial judge in his October 31, 1991, order denying Ginger's change-of-custody motion, observed that, "since 1989, Ginger has 'changed her life.'" Although he declined to hold "that under present circumstances Ginger is an unfit parent," Judge Graham nevertheless found that "it is in the best interests of Robin that she remain in the custody of her grandmother who has provided for her and cared for her for virtually her entire life." He further found as follows:

> Robin attends school in Frankfort where she does well and where her teachers describe her as a "happy, clean, cheerful, well-dressed and motivated child." Social workers describe Ortha Shifflet's home as immaculate and cozy. Robin has a "Big Sister" who describes Robin as a happy child and voiced her opinion that Robin wants to stay in Frankfort, Kentucky, and live with her grandmother.
>
> Obviously, Robin and Ortha have developed a very strong relationship. Ortha has taken care of Robin on a day-to-day basis since her infancy. Even when Ginger was out of prison, most of the responsibility for the care of Robin and other of her children fell to Ortha. Ortha sees that Robin attends Crestwood Baptist Church each Sunday where she participates in children's activities. Ortha attends Robin's

parent-teacher conferences and takes an active role and interest in her school activities. Robin has her own room, clothes and toys and enjoys many friendships which she has developed over the years.

As pointed out in the Majority opinion, the Court of Appeals panel, in a split decision, found that the trial court erred in basing its decision, at least in part, on the provision of KRS 403.340(2) regarding the modification of a prior custody decree. The statute sets out the following standards which are to be considered:

> ... the court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior decree unless: (a) The custodian agrees to the modification; (b) The child has been integrated into the family of the petitioner with the consent of the custodian; or ...

The Court of Appeals' majority held that the quoted standards were intended to apply only to possible modification of permanent awards of custody and further that the "best interests of the child" test set out in KRS 403.270 only applies in custody disputes between parents, not between a parent and a nonparent.

Technically speaking, the Court of Appeals is correct as to the basic purpose of the standards set out in the quoted statutes. Nonetheless, the statutes need not be so narrowly construed as the majority opinions of the Court of Appeals and of our Court would seem to suggest. Indeed, the entire expression of legislative intent contained in the statutes dealing with custody of children clearly follows a longstanding public policy in Kentucky looking to "the best interests of the child" as its polestar. Three-quarters of a century ago, this Court stated:

> In every instance, however, the welfare of the child must guide us, and, if its welfare should imperatively require such a step, it would be our duty to take the custody of the child from both parents and confer it upon another better able to properly care for the child. *Shallcross v. Shallcross*, 135 Ky. 418, 122 S.W. 223.

*Burton v. Burton*, 184 Ky. 268, 211 S.W. 869, 871 (1919).

Needless to say, while following this principle, the courts must, at the same time, balance the fundamental rights of parents to the custody of their children. KRS 405.020. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

Judge Emberton in his dissent in this case from the majority in the Court of Appeals, suggests that in thus balancing these sometimes conflicting interests, courts may properly consider the voluntary actions of parents whereby they effect a forfeiture of some or all of their natural rights. He cites some earlier opinions which have equated this process to an equitable estoppel or "quasi-estoppel," including *James v. James*, Ky., 457 S.W.2d 261 (1970); *McNames v. Corum*, Ky., 683 S.W.2d 246 (1985); and the Ohio Supreme Court in *Masitto v. Masitto*, 22 Ohio St.3d 63, 488 N.E.2d 857 (1986), wherein it was held that when a parent relinquishes control of a child to a nonparent, the care and support furnished may be for such a length of time and under such circumstances as to estop the parent from denying that she has forfeited her natural right to custody of the child.

In *Van Wey v. Van Wey*, Ky., 656 S.W.2d 731 (1983), this Court was called upon to decide whether the Jefferson Circuit Court had properly terminated a natural mother's parental rights after she attempted to revoke her original voluntary consent to termination and adoption. Justice Leibson, writing for the majority, stated at p. 737:

> We hold with the trial court that the initial voluntary consent placed this case squarely in the category of cases holding that a parent who has transferred possession and custody of his or her child to another has surrendered the primary right of custody and thereafter the court shall determine

custody on the basis of the best interest of the child.

*Van Wey* further cites with approval the holding of *Rose v. Ledford,* 306 Ky. 662, 208 S.W.2d 957 (1948), that "a parent may not take (children) away from those to whom he surrendered them without first showing that it would be for the best interest of the child to do so." Further, the principle of waiver was recognized in *Van Wey* when the Court stated on p. 735:

A long line of Kentucky cases beginning with *Lee v. Thomas,* 297 Ky. 858, 181 S.W.2d 457 (1944), where the mother signed her consent for adoption in the hospital and then attempted to revoke her consent and resist the adoption procedure, hold that the interest and welfare of the infant must then be considered. The right of the parent to reclaim the child is not extinguished, but the parent's superior statutory right to custody has been waived so that thereafter the court will look primarily to the child's welfare in awarding custody. [Citing cases.]

Among the cases cited in support of the waiver principle was *Shaw v. Graham,* Ky., 310 S.W.2d 522 (1958), which held at p. 523:

With respect to the custody of the children, we have held in numerous cases that where a parent has consigned their care to their grandparents, who are suitable for discharging the trust, and has acquiesced in that commitment, he or she may not take them away without first convincing the court that it would be to the best interest of the children that it be done. *Vetter v. Goff,* 306 Ky. 505, 208 S.W.2d 514.

While the concepts of waiver and estoppel involve nearly identical philosophies as here used, we think, to be precise, the doctrine at work here is more properly categorized as one of waiver rather than estoppel. Especially is this so since the former is essentially unilateral, resulting as a legal consequence from some act or conduct of the party against whom it operates, without any act being required of the party in whose favor it is made, in order to complete it. Estoppel, of course, requires proof of the other party having been misled. *See* BLACK'S LAW DICTIONARY 1580 (6th ed. 1990), and *Barker v.*

*Stearns Coal & Lumber Co.,* 291 Ky. 184, 163 S.W.2d 466, 470 (1942).

Among the factors the trial court should consider in deciding whether waiver occurred are: (1) length of time the child has been away from the parent; (2) circumstances of separation; (3) age of the child when care was assumed by the nonparent; (4) time elapsed before the parent sought to reclaim the child; and (5) frequency and nature of contacts, if any, between the parent and the child during the nonparent's custody. Conversely, a short-term visit or delivery of possession shall not be construed as proof that a knowing and voluntary waiver has occurred.

Following those guidelines, certainly the circumstances under which the custody of Robin was surrendered to her grandmother and the length of time the child has been left in Ortha's care would be important considerations in reaching any decision as to whether there has been a waiver.

In conclusion, I am of the opinion that the majority of the Court of Appeals erred in reversing the trial court out of hand and directing the award of permanent custody of Robin to her mother, Ginger. Accordingly, I also would reverse the decision of the Court of Appeals and remand this case to the trial court, but would direct further consideration and findings consistent with this opinion rather than in accordance with those set out in the Majority opinion.

WINTERSHEIMER, J., joins this concurring opinion.