Scarlett Rosa CONSALVI, Appellant,

v.

Christopher David CAWOOD and Brian E. Stricklin, Appellees,

and

Christopher David Cawood, Cross-appellant,

v.

Scarlett Rosa Consalvi And Brian E. Stricklin, Cross–Appellees.

Nos. 2000–CA–001963–MR, 2001–CA–000010–MR, 2001–CA–000037–MR.

Court of Appeals of Kentucky.

Dec. 14, 2001.

Michael L. Judy, Johnson, Judy, True & Guarnieri, LLP, Frankfort, KY, for Appellant/Cross Appellee, Scarlett Rosa Consalvi.

Joy Anna Anderson, Lexington, KY, for Appellee/Cross Appellant, Christopher David Cawood.

Stephen G. Amato, McBrayer, McGinnis, Leslie & Kirkland, PLLC, Lexington, KY,

for Appellant/Cross Appellee, Brian Stricklin.

Douglas T. Logsdon, McBrayer, McGinnis, Leslie & Kirkland, PLLC, Lexington, KY, for Appellant/Cross Appellee, Brian Stricklin.

Before BARBER, GUIDUGLI, and TACKETT, Judges.

## OPINION AND ORDER

TACKETT, Judge.

Scarlett Consalvi appeals from the judgment of the Fayette Circuit Court, holding that her ex-husband, Chris Cawood, was a de facto custodian of her children, six-year-old T.C. and four-year-old S.C. Cawood cross-appeals, arguing that the circuit court erred by failing to award him sole custody of the children. With respect to Scarlett's appeal, we reverse, and affirm with respect to the cross-appeal.

This case has a highly unusual set of facts, described by the trial court as "the ... most complicated and difficult this Court has been required to decide." Consalvi and Cawood married on April 1, 1994, one month after T.C. was born. At the time, Consalvi was 19, and Cawood was 17. Consalvi contends that Cawood knew that he was not the father of T.C.; Cawood argues that Consalvi led him to believe that he was. When the couple first lived together, they resided with Consalvi's mother, Sharon Hardesty. Serious problems arose between the couple and Hardesty which eventually culminated in a physical altercation and Hardesty seeking the issuance of an Emergency Protection Order. In July 1995, the parties separated, and Consalvi began a relationship with another man, Brian Stricklin. Consalvi and Cawood reconciled in November 1995, but by then Consalvi was already pregnant with S.C., Consalvi having conceived the child some time in the month of September. Consalvi maintains that Cawood knew he could not be the father of S.C.; Cawood, on the other hand, argues that Consalvi again led him to believe that the child was his. Significantly, however, there is no evidence that indicates the parties maintained any kind of sexual relationship during the separation.

The parties finally separated in November 1998, after several shorter separations. A temporary order of joint custody was entered over Consalvi's objection in June 1999. Shortly thereafter, a paternity test revealed that Cawood was not, in fact, the father of either child. A short time after that, in late June, Consalvi made the first sexual abuse allegations against Cawood. An emergency hearing was held on July 2, 1999, and a temporary protective order was entered pending further investigation. Further investigation by the Cabinet for Families and Children failed to substantiate the allegations.

Consalvi consulted two experts, Carl Moses, LCSW, and Dr. Lane Veltkamp, a psychiatrist at the University of Kentucky Medical Center. Veltkamp concluded that Cawood had engaged in inappropriate and violent behavior directed toward Consalvi and both children, and recommended that he have no further contact with the children. Moses concluded that the older child, T.C., had been subjected to physical violence by Cawood and had also witnessed violence directed toward Consalvi. Moses recommended that T.C. not continue the relationship with Cawood. The trial court, at the hearing on this matter, criticized the above reports and discounted the conclusions presented in them, based on what the court characterized as a "completely arbitrary and one-sided presentation of the so-called 'facts'" by Scarlett Consalvi. Among other things, it is apparent that Consalvi told Veltkamp that the sexual abuse allegations had in fact been substantiated, that Cawood was "an of-

fender of pervasive domestic violence," that visitation ceased in June 1999 because the children did not wish to see Cawood, and that paternity of the children had been established as of May 1999. The trial court rejected Moses and Veltkamp's conclusions entirely, based on Consalvi's slanted presentation of the facts.

The matter was heard on May 8 and 9, 2000. The trial court, after finding that the children had an established relationship with Cawood and that it would be in their best interests to continue the relationship, ordered joint custody, with Consalvi as the primary custodian. In order to reach this holding, the court found that Cawood was a de facto custodian under the new Kentucky Revised Statute (KRS) 403.270, and thus had the same standing as a natural parent. Further, the trial court applied *Greathouse v. Shreve*, Ky., 891 S.W.2d 387 (1995) as an alternative to the central holding, finding that Consalvi had waived her superior right as a natural parent by her conduct. Consalvi objected to the use of the de facto custodian statute, arguing that it was unconstitutional as applied to her, citing *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The trial court, however, rejected Consalvi's position and applied what could be termed a balancing test between the rights of the parent to raise the child as she sees fit, and the right of the child to continue an established relationship. This appeal followed.

Consalvi argues on appeal that KRS 403.270(1) is unconstitutional, both on its face and as applied to her. She also argues that the de facto custodian statute should not apply, if the statute is held to be constitutional, because Cawood does not meet the criteria for a de facto custodian as defined in the statute. Specifically, what the statute requires is that someone act as the "primary caregiver" for a child

in the place of the natural parent. We will address this argument first.

■■■ The statute reads as follows:

(1)(a) As used in this chapter and KRS 405.020, unless the context requires otherwise, "de facto custodian" means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period.

(b) A person shall not be a de facto custodian until a court determines by clear and convincing evidence that the person meets the definition of de facto custodian established in paragraph (a) of this subsection. Once a court determines that a person meets the definition of de facto custodian, the court shall give the person the same standing in custody matters that is given to each parent under this section and KRS 403.280, 403,340, 403.350, 403.420, and 405.020.

The statute requires that a person be "the primary caregiver for, and financial supporter of, a child ... for a period of one (1) year or more...." The court held that Cawood was "a primary caregiver" for the children, but did not find that he was "**the**

primary caregiver." (Emphasis added.) We are bound by the plain language of the statute, and words not defined must be given their ordinary meanings. In this case, it is clear that the statute is intended to protect someone who is the primary provider for a minor child in the stead of a natural parent; if the parent is not the primary caregiver, then someone else must be. The de facto custodian statute does not, contrary to Cawood's position at oral argument, intend that multiple persons be primary caregivers. The court's finding that he was "a primary caregiver" and "a financial supporter" is not sufficient to establish that he was indeed "**the** primary caregiver" within the meaning of the statute. It is not enough that a person provide for a child alongside the natural parent; the statute is clear that one must literally stand in the place of the natural parent to qualify as a de facto custodian. To hold otherwise would serve to expand a narrowly drawn statute intended to protect grandparents and other persons who take care of a child in the absence of a parent into a broad sweeping statute placing all stepparents on an equal footing with natural parents. In light of both the legislative history and the common sense interpretation of the language of the statute, we do not believe that this result was contemplated by the General Assembly; accordingly, we conclude that the trial court's interpretation of the statute was incorrect, and reverse.

Further, we disagree with the trial court's interpretation of the precedent found in *Greathouse, supra,* and *Shifflet v. Shifflet,* Ky., 891 S.W.2d 392 (1995). These cases, rendered prior to the amendment of KRS 403.270, address the question of waiver (not estoppel) in the context of child custody. In *Greathouse,* the Kentucky Supreme Court held that a waiver must be a "knowing and voluntary relinquishment of a known right," and further that in order for a grandparent's claim to custody of a child to succeed against the right of a natural parent, the grandparent must establish by clear and convincing evidence that such a waiver was made. In *Shifflet,* also, a parent who had left her child in the custody of the child's grandmother for an extended period of time was denied custody of the child by the trial court, then awarded custody on review by the Court of Appeals, which reversed with directions. The Kentucky Supreme Court, on discretionary review in *Shifflet,* reversed the Court of Appeals without affirming the trial court, and instead held that the child's grandparent would be required to establish waiver of the natural parent's superior right by the standard established in *Greathouse* before custody could be awarded to her under the "best interest of the child" standard.

The trial court's reliance here on *Greathouse* and *Shifflet* is misplaced. The facts in the case *sub judice* do not establish waiver. Moreover, these cases were superseded by the amendment of KRS 403.270(1). The de facto custodian statute is at present the governing law in this and similar cases. For the reasons discussed above, the statute does not apply in this circumstance. It may be that an argument for estoppel can be made; however, the trial court specified that its finding was based on a principle of waiver under *Greathouse.* The court used the term "estoppel" in the language of its holding, but did not cite authority for the application of an estoppel theory in this context. The court based its theory on the right of the children to continue an established relationship. However, again no authority was cited to support its holding and we conclude that there is not sufficient authority to support the use of waiver or estoppel in establishing that the parent has waived her superior right as a natural parent in

favor of what appears to be a largely undefined child's right at this time. As noted by Justice Stevens of the United States Supreme Court in his dissent in *Troxel,* while the courts have recognized that children have rights, the extent of those rights has never been defined. We decline to do so; the nature and extent of a child's right in these circumstances must be defined by the Kentucky Supreme Court or else by the General Assembly.

■ Turning to the constitutional question presented, *we do not need to address whether the statute was unconstitutional as applied,* as we have held the statute is not applicable to this case. We are then left with the argument that the statute is unconstitutional on its face. *Troxel* stopped short of declaring all statutes affecting nonparents' right to custody and visitation unconstitutional, preferring to leave that judgment to the state courts on a case-by-case basis. *Troxel,* 530 U.S. at 73, 120 S.Ct. at 2064. The question then becomes whether KRS 403.270 infringes on the constitutional right of a natural parent to raise her child as she sees fit without due process of law. This substantive component of the right to due process under the Fourteenth Amendment has been recognized in a long line of cases: *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Reno v. Flores,* 507 U.S. 292, 301–302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and was relied upon by the plurality in *Troxel.* The trial court here quoted *Troxel* in holding that the statute was not unconstitutional on its face:

> Neither the Washington nonparental visitation statute generally-which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted-nor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional.
>
> Because we rest our decision on the sweeping breadth of § 26.10.160(3) and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Court-whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. In this respect, we agree with Justice Kennedy that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best "elaborated with care." (citation omitted). Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter. *Troxel* at 2064.

The Washington state statute at issue in *Troxel* was extremely broad and essentially allowed anyone to petition the court for visitation, and authorized the court to grant visitation if it determined that the visitation would be in the best interest of the child. The problem with the statute in *Troxel* was that it allowed the court to substitute its judgment for that of the parents, in derogation of the parents' constitutional right to determine what is and is not in the best interest of the child. While Justice Stevens, in dissent, noted that there are times when a parent may

not be acting in the child's best interest but out of their own self-interest, a fit parent is generally presumed to act in the best interest of their child. Therefore, said the Court in *Troxel*, the application of the statute to impose unwanted visitation by a third party on parents who have not been found to be unfit violates the parents' substantive due process rights.

Kentucky's de facto custodian statute is confined to a narrower circumstance; when another person has acted as the primary caregiver of the child for a year or more, then that person may be found to be on an equal footing with the parent of the child. On its face, our statute is not unconstitutional; however, the question of whether the statute may be applied unconstitutionally is expressly reserved, given our specific holding that the statute does not apply in this case.

With respect to the cross-appeal, we must conclude that in light of our holding that the de facto custodian statute does not apply to Cawood and he is not entitled to sole custody. Accordingly, the cross-appeal is dismissed.

The judgment of the Fayette Circuit Court is reversed and remanded for further proceedings consistent with this opinion.

ALL CONCUR.