ACREE, JUDGE, CONCURRING:
I concur in the majority opinion. As opinions of this Court must, it faithfully follows established jurisprudence; specifically, it follows Mullins v. Picklesimer , 317 S.W.3d 569 (Ky. 2010). Seeing no way to distinguish Mullins , it became my duty to concur when Judge Thompson dissented; otherwise, I would cause my Court to violate SCR 4 1.030(8)(a) ("Court of Appeals is bound by and shall follow applicable precedents established in the opinions of the Supreme Court....")
However, while it is this Court's duty "to follow precedent established by [the] higher court," it is also this Court's duty to "set forth the reasons why, in its judgment, the established precedent should be overruled...." Special Fund v. Francis , 708 S.W.2d 641, 642 (Ky. 1986). Doing so advances our jurisprudence, as when " '[w]e ... encourage[d] our Supreme Court to revisit th[e] issue [of parental consortium] in the light of modern developments in this area of the law.' " Giuliani v. Guiler , 951 S.W.2d 318, 319 (Ky. 1997) (quoting the Court of Appeals opinion on review). I encourage the Supreme Court to revisit Mullins .
Mullins was rendered in a different era of American jurisprudence-the pre- Obergefell era. Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 192 L.Ed. 2d 609 (2015) (Fourteenth Amendment guarantees to same-sex couples fundamental right to marry). The movement to recognize a person's right to marry someone of his or her same sex did not occur in a vacuum; it was largely prompted by the ancillary prohibitions on the ability of same-sex couples to raise children together. We should be frank and admit that the state constitutional and statutory prohibition of same-sex marriage challenged judicial discipline as our jurists considered modern parent-child relationships. The challenge for many was to answer the objective question-what is the law?-rather than the subjective question-what seems the right thing to do? Which question Mullins answered is now irrelevant because of Obergefell .
*871 But we cannot escape the fact that Mullins was decided as it was because of, and as a way of avoiding, the pre- Obergefell era prohibitions. Like them or not, and whether intentionally targeting the gay community, or not, the prohibitions were based either in our state constitution or were statutory. They prohibited same-sex marriage. KY. CONST. 233A. They prohibited adoption of a same-sex partner's biological or adopted child without terminating that partner's parental rights. S.J.L.S. v. T.L.S. , 265 S.W.3d 804, 820 (Ky. App. 2008). And by the statutory creation of the de facto custodian, Kentucky courts lost the ability to apply the in loco parentis doctrine that might have allowed a same-sex partner the standing to seek custody or visitation with her non-biological child. B.F. v. T.D. , 194 S.W.3d 310, 311-12 (Ky. 2006). Mullins was a "hack"[5] to clear some of these blockages.
Granted, the solution required a little judicial contortion. The Court had to use Kentucky's Uniform Child Custody Jurisdiction and Enforcement Act in a way different than its intended fundamental purpose of resolving jurisdictional contests between states. Wallace v. Wallace , 224 S.W.3d 587, 589 (Ky. App. 2007) ("the fundamental purpose of the UCCJEA remains the avoidance of jurisdictional competition and conflict with other states in child custody matters"). The truth about Mullins is there was no jurisdictional conflict. In fact, as the Court noted, the parties "forum shopped" to find a court that would not interfere with their plan to parent a child together despite the prohibition of their marriage.[6]
Perhaps the duplicitous efforts by the parties in Mullins are understandable. The same statutory scheme that allowed stepparent adoption without terminating the biological parent's parental rights did not allow the equivalent results in same-sex relationships. S.J.L.S. , 265 S.W.3d at 820 (citing KRS 199.500(1) and KRS 199.520(2) ). Upon the separation of heterosexual parents, one of whom adopted the *872 other's child, the adopting parent's rights to custody and visitation are enforceable equally with the biological parent. But when same-sex partnerships broke up, there was no such protection. Mullins fixed this consequence of the statutory impediment to adoption within same-sex partnerships by vesting in the non-biological parent the possibility of claiming custody and visitation rights when such a partnership goes south.
In this post- Obergefell era, some informed commentators[7] would say it is unfortunate that Mullins also had the effect of weakening the biological parent's parental rights protections against attack by her children's stepfather or even her live-in boyfriend. That is because Mullins provides a "back door" to the requirement in KRS 199.500(1) that the biological parent consent to adoption; Mullins provides a "work around" protection that parenting the child alongside the natural parent does not meet the de facto custodian standard. Consalvi v. Cawood , 63 S.W.3d 195, 198 (Ky. App. 2001), abrogated on other grounds by Moore v. Asente , 110 S.W.3d 336 (Ky. 2003). These non-statutory shortcuts are what I believe this case highlights-the unintended consequences of Mullins .
The Mullins solution to the pre- Obergefell prohibitions is simply unnecessary today. Same-sex partners can marry and, if one is a biological or adoptive parent, he or she may allow his or her spouse to adopt the child pursuant to KRS 199.500(1) and KRS 199.520(2). Yet Mullins remains good law and an open door through which to assault the constitutionally protected right of a person to parent his or her biological or adopted child. The case before us demands an answer to the following question: is Mullins applicable only "when the child was conceived by artificial insemination with the intent that the child would be co-parented by the parent and her [same-sex] partner ..."? Mullins , 317 S.W.3d at 575. Such an interpretation would tacitly admit Mullins is the hack I assert it is and, as the dissent in Mullins said, "writ[ten] with a wide legislative brush[.]" Id. at 581 (Cunningham, J., concurring in part and dissenting in part).
If Mullins is to maintain its viability, it must be applicable to heterosexual relationships like the one created when Caudill married Fry, and to the family the marriage created to include the boys who call Fry their "Dad." The Supreme Court of the United States would hold that when these parties married, a family was created providing fertile ground for unique bonds all around. Obergefell , 135 S.Ct. at 2601 ("marriage is the foundation of the family" (internal quotation marks and cite omitted) ). For as long as it lasted (and certainly longer), their marriage, like every marriage, "safeguard[ed these] children and [this] famil[y] and thus dr[ew] meaning from related rights of childrearing...." Id. at 2600. The parties' marriage "allow[ed these] children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." Id. (internal quotation marks and citation omitted).
In Mullins , the Supreme Court of Kentucky strived to honor and protect the bond between Mullins and her partner's child-a bond previously recognized as founded only in a marriage. Supporters of same-sex marriage staked a claim to that foundation, advocating mightily for the *873 right to marry, not frivolously, but for the very qualities of marriage and family described in Obergefell , and more. Obergefell , 135 S.Ct. at 2608 (these advocates "respect it [the idea of marriage] so deeply that they seek to find its fulfillment for themselves"). How can we ignore what this means?-it means that marriage itself is significant evidence of a biological parent's intention to waive her superior parental rights in favor of her new spouse.
If the evidence in Mullins was enough to show waiver, how disingenuous would we appear if we said the evidence here, starting with Caudill's momentous decision to marry Fry, is lacking? How inconsistent would we appear if we failed to say a divorce "does not diminish the strong parental bond that has been allowed to develop between the child[ren] and the nonparent"? Mullins , 317 S.W.3d at 577.
So long as the door to custodial and visitation rights based on waiver remains open, it must be open to heterosexual and homosexual relationships equally, whether a marriage is involved or not. The fact is, the reason for opening that door in the first place is now behind us. Only the Supreme Court can close the door, and only the Supreme Court should determine whether it is best to do so.
For these reasons, I encourage our Supreme Court to revisit this issue of the waiver of parental rights in the light of modern developments in this area of the law. And, for these reasons, I concur.

The original definition of the term "hack" is "to clear (a road, path, etc.) by cutting away vines, trees, brush or the like[.]" Random House Dictionary of the English Language 857 (2nd ed. 1987) (definition 3). In the modern vernacular it is often used to describe an inelegant but effective solution to a specific computing problem. The Urban Dictionary offers this definition: "A temporary, jury-rigged solution, especially in the fields of computer programming and engineering: the technical equivalent of chewing gum and duct tape." https://www.urbandictionary.com/define.php?term=hack (last visited April 14, 2018). Most recently, "life hack" is used to describe creative solutions to life problems without following the rules. https://www.merriam-webster.com/dictionary/life hack (Merriam-Webster online dictionary ("LIFE HACK ... a usually simple and clever tip or technique for accomplishing some familiar task more easily and efficiently").

Summarizing how Mullins obtained de facto custodian status, the Court said:
It is undisputed that the parties signed the following documents on January 20, 2006: petition for custody; entry of appearance and consent to custody; and agreed judgment of custody. The documents stated that Mullins was the de facto custodian of Zachary-that Mullins was his primary caregiver and primary financial supporter for a period of time not less than six months from the date of his birth.
Even though the parties were living in Lincoln County, the petition and entry of appearance were filed in the Garrard Circuit Court without objection by either party. Without an evidentiary hearing, depositions, or any form of evidence taken prior thereto, the trial court signed the agreed judgment and entered the same on February 3, 2006. No appeal was filed from this judgment.
Mullins , 317 S.W.3d at 572 ; see also S.J.L.S. , 265 S.W.3d at 809 (describing a different same-sex couple's similar legal approach to a "long-term plan [for] raising a child together").

I would venture to identify Judge Thompson as such an informed commentator, based on his dissent.