RENDERED: DECEMBER 1, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1397-MR

RACHEL SIZEMORE                                           APPELLANT


                     APPEAL FROM GREENUP CIRCUIT COURT
v.                          FAMILY COURT DIVISION
              HONORABLE JEFFREY L. PRESTON, JUDGE
                   ACTION NO. 21-CI-00476


VIRGIL R. HUTTON AND BONNIE
C. HUTTON                                       APPELLEES


OPINION
AFFIRMING IN PART,
VACATING IN PART, AND REMANDING

** ** ** ** **

BEFORE: CETRULO, COMBS, AND EASTON, JUDGES.

EASTON, JUDGE: The Appellant, Rachel Sizemore ("Rachel") appeals from the

Greenup Family Court's order which granted *de facto* custodian status to the

Appellees, Virgil and Bonnie Hutton ("Huttons"), and named them primary

residential custodians of Rachel's son ("Child") under a joint custody decision.

Rachel argues she co-parented the Child with the Huttons, and they cannot be considered *de facto* custodians under Kentucky law. In the alternative, Rachel argues that, even if the Huttons could be deemed *de facto* custodians, the family court erred in its determination of timesharing because it did not apply the statutory presumption of equal timesharing under KRS[1] 403.270(2). Having reviewed the record and the applicable law, we affirm the decision that the Huttons are *de facto* custodians, but we vacate and remand for further proceedings regarding timesharing under the joint custody decision.

## FACTUAL AND PROCEDURAL HISTORY

Rachel is the biological mother of the Child, who was born in March 2013. The Huttons are the Child's maternal great-grandparents. The Child's father is deceased. The Child has a younger sibling ("Sibling"), who is not a party in this action but must be mentioned for the background of this case. The Sibling's father is not the same as the Child's, but the Child and the Sibling were raised together for a time.

When the Child was an infant, Rachel made the decision to go back to school to become a nurse practitioner while she also worked as a travelling nurse. Rachel, her parents, and the Huttons (her grandparents) agreed the family would assist Rachel with childcare so she could work and go to school. Initially, the

---

[1] Kentucky Revised Statutes.

Huttons baby-sat the Child a few days a week. Gradually, they kept him for longer periods, including overnights. Finally, the Huttons claim the Child has lived with them almost exclusively since he was two years old.

The testimony offered by Rachel included that of her own father who recognized the primary custody exercised by the Huttons for at least the last couple of years. Despite this testimony Rachel insists the Huttons did not have as much time with the Child as alleged, although she concedes the Huttons kept the Child at their home consistently for multiple days at a time. To permit the Huttons to help raise the Child, Rachel signed a medical power of attorney for the Huttons.

In September 2021, the Cabinet for Health and Family Services ("Cabinet") opened an investigation due to allegations of inappropriate behavior between the Child and his Sibling. A dependency, neglect, and abuse ("DNA") petition was filed in December 2021. At the initial DNA hearing, the court granted temporary custody of the Child to the Huttons. The court additionally issued an order that the children were not to be together unsupervised.

The Huttons filed the family court custody petition four days after being granted temporary custody in the DNA action. In their petition, they claim to have been the Child's full-time caretakers since 2014. They asked the family court to name them *de facto* custodians of the Child and to grant them custody.

The family court granted them temporary custody based on the ruling in the DNA action. The family court scheduled a final hearing.

The final hearing was held in October of 2022. The Huttons testified that they had been the Child's primary caregivers since the Child was approximately two years old. The Child has a bedroom in their home. They stated they were the ones who took the Child to medical and dental appointments. They potty-trained the Child. The Child got on and off the bus for school at their home. They were the ones who assisted with homework and communicated with the Child's teachers. They further testified they provided the Child's food, clothing, toys, and school supplies.

In addition to their testimony, the Huttons elicited testimony from family members, the Cabinet worker who investigated the allegations regarding the Child and the Sibling, teachers from the Child's school, and the pastor of their church. The Huttons' witnesses all gave consistent testimony. They all stated that the Child had a bedroom at the Huttons' home and all his belongings were there. They all testified that the Child lived with the Huttons. The teachers testified their communication regarding the Child was with the Huttons, not Rachel. The pastor stated the Huttons had the Child with them in church every Sunday. All parties testified that they would see the Child at the Huttons' home when they visited unless the Child was in school.

-4-

The Cabinet investigator testified it was not necessary to file the DNA petition immediately, as the Child was already living with the Huttons. Everyone signed a prevention plan agreeing that they would not allow the Child and his Sibling to be around each other unsupervised. The investigator testified the reason the petition was filed was to obtain court orders to force Rachel to take the Sibling to counseling. The investigator testified that while Rachel was cooperative during the investigation, the investigator had trouble getting Rachel to comply with the counseling recommendation for the Sibling. The investigator testified the Huttons cooperated in every way.

Rachel offered the testimony of her parents and her brother at the hearing. She also testified herself. All of Rachel's witnesses stated they believed the family agreed to help Rachel with her children while she furthered her education and worked. They all testified that Rachel never intended the arrangement to be permanent. Rachel's parents testified they helped Rachel by baby-sitting the Sibling. They all believed Rachel to be a good mother who can raise both her children. Rachel's brother testified he heard the Huttons make disparaging remarks about Rachel in front of the Child. Rachel's mother additionally testified that Bonnie Hutton became verbally abusive to her and to Rachel.

Rachel disputed the Huttons' testimony that the Child lived with them. She stated that while the Child did stay with them often, the Child's home was still with her. She testified the Child's name was on her current lease. Rachel's home has only two bedrooms. One bedroom was occupied by Rachel and her husband (not father of either child).

The other bedroom was for the Sibling, whom the Child cannot be around without supervision. Rachel testified this bedroom had both children's belongings in it. This was of concern because of the prior situation with these children when they were alone together resulting in the DNA case.

Rachel further disagreed that the Huttons were the primary financial providers for the Child. The Huttons testified they paid for almost everything for the Child. Rachel alleged she provided diapers and formula when the Child was a baby. The Huttons claimed Rachel got WIC[2] to buy the diapers and formula, and they often had to supplement what Rachel gave them. Rachel received state assistance to pay for the Child's daycare, but both parties agreed the assistance did not cover the entire cost. Both Rachel and the Huttons claimed to have paid the additional cost of daycare. Rachel alleged she regularly bought clothes, shoes, and gifts for the Child, while the Huttons claim these purchases were few and far

---

[2] Women, Infants, and Children; a supplemental food program for low-income families.

between.  The Child's medical insurance was through a medical card obtained by Rachel.

The family court issued an order on October 5, 2022.  The court concluded the Huttons were *de facto* custodians of the Child.  The court further named them the Child's primary residential custodians, with Rachel to receive visitation as agreed, but no less than the Greenup County guidelines.  The family court ruled that Rachel would not have overnight visitation during the school week or when the Sibling was present, due to the circumstances of the DNA action.  At the time of the family court's order, the DNA action was still pending and the order of no unsupervised contact between the children was still in place.

Rachel filed a Motion to Alter, Amend, or Vacate on October 13, 2022, which the family court overruled.  Rachel timely filed this appeal.  Further facts and testimony will be discussed as it becomes relevant to our analysis.

**STANDARD OF REVIEW**

We review a family court's legal conclusions under the *de novo* standard.  *Brewick v. Brewick*, 121 S.W.3d 524, 526 (Ky. App. 2003).  Whether a nonparent can be classified as a *de facto* custodian is a matter of law.  *Hoskins v. Elliott*, 591 S.W.3d 858, 861 (Ky. App. 2019).

Appellate review of custody awards is for abuse of discretion.  *Gertler v. Gertler*, 303 S.W.3d 131, 133 (Ky. App. 2010).  Abuse of discretion occurs

when a ruling is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

We are allowed to set aside the trial court's factual findings only if they are clearly erroneous. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Findings of fact are clearly erroneous when they are not supported by substantial evidence. *Id.* "Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence, has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* (internal quotation marks, brackets, footnotes, and ellipses omitted). Due regard must be given when the trial court assesses witness credibility. CR[3] 52.01.

## ANALYSIS

Rachel raises two issues in this appeal. First, she argues the family court erred in its findings and the conclusion that the Huttons were *de facto* custodians of the Child. Alternatively, she argues that even if they did qualify as *de facto* custodians, the family court erred in its order for timesharing. She claims the family court did not properly apply the statutory presumption of equal timesharing when designating the Huttons the primary residential custodians of the Child.

---

[3] Kentucky Rules of Civil Procedure.

KRS 403.270 is the controlling statute regarding both issues of Rachel's appeal. It defines a *de facto* custodian as follows:

(1) (a) As used in this chapter and KRS 405.020, unless the context requires otherwise, "de facto custodian" means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services. Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period.

(b) A person shall not be a de facto custodian until a court determines by clear and convincing evidence that the person meets the definition of de facto custodian established in paragraph (a) of this subsection. Once a court determines that a person meets the definition of de facto custodian, the court shall give the person the same standing in custody matters that is given to each parent under this section and KRS 403.280, 403.340, 403.350, 403.822, and 405.020.

Initial custody determinations are likewise controlled by KRS 403.270(2), which states as follows:

The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent and to any de facto custodian. Subject to KRS 403.315, there shall be a presumption, rebuttable by a preponderance of evidence, that joint custody and equally shared parenting time is in the best interest of the child. If a deviation from equal parenting

-9-

time is warranted, the court shall construct a parenting time schedule which maximizes the time each parent or de facto custodian has with the child and is consistent with ensuring the child's welfare. The court shall consider all relevant factors including:

(a) The wishes of the child's parent or parents, and any de facto custodian, as to his or her custody;

(b) The wishes of the child as to his or her custodian, with due consideration given to the influence a parent or de facto custodian may have over the child's wishes;

(c) The interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect the child's best interests;

(d) The motivation of the adults participating in the custody proceeding;

(e) The child's adjustment and continuing proximity to his or her home, school, and community;

(f) The mental and physical health of all individuals involved;

(g) A finding by the court that domestic violence and abuse . . . has been committed by one (1) of the parties against a child of the parties or against another party. The court shall determine the extent to which the domestic violence and abuse has affected the child and the child's relationship to each party, with due consideration given to efforts made by a party toward the completion of any domestic violence treatment, counseling, or program;

-10-

(h) The extent to which the child has been cared for, nurtured, and supported by any de facto custodian;

(i) The intent of the parent or parents in placing the child with a de facto custodian;

(j) The circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian, including whether the parent now seeking custody was previously prevented from doing so as a result of domestic violence as defined in KRS 403.720 and whether the child was placed with a de facto custodian to allow the parent now seeking custody to seek employment, work, or attend school; and

(k) The likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent . . . except that the court shall not consider this likelihood if there is a finding that the other parent . . . engaged in domestic violence and abuse . . . against the party or a child and that a continuing relationship with the other parent will endanger the health or safety of either that party or the child.

Rachel first claims the family court erred in its conclusion that the Huttons were the Child's *de facto* custodians. She argues that she co-parented the Child with the Huttons, and they cannot be considered *de facto* custodians under Kentucky law. Rachel is correct in that "[a] grandparent who co-parents a child with the natural mother or father does not make the grandparent the primary caregiver. It has been held that parenting the child alongside the natural parent does not meet the *de facto* custodian standard in KRS 403.270(1)(a)." *Chadwick v. Flora*, 488 S.W.3d 640, 644 (Ky. App. 2016) (internal quotation marks and

-11-

citations omitted). Thus, our analysis turns on the question of whether the Huttons were *the* primary caregivers for the Child rather than basically being involved in an equal co-parenting situation.

The Huttons filed their petition for custody when the Child was eight years of age. They testified the Child had been living with them on a full-time basis since the Child was two years old. While Rachel disputed this testimony, the family court accepted this testimony when making its findings of fact. The weight to be given such testimony is for the family court to determine. CR 52.01. "As the factfinder, it is the trial court's prerogative to make findings of fact according to its own weighing of the evidence." *Cabinet for Health & Fam. Servs. v. L.G.*, 653 S.W.3d 93, 101 (Ky. 2022).

The evidence presented supports this finding of long-term residence with the Huttons. The Child has his own bedroom in the Huttons' home, but not in Rachel's home. The Child's teachers communicated primarily with the Huttons. Everyone who visited the Huttons' home saw the Child there, unless he was in school. We do not believe these findings by the family court are clearly erroneous. The findings are based on clear and convincing testimony. The Huttons very clearly met the one-year statutory requirement to be considered *de facto* custodians.

The analysis does not end with these findings. Rachel contends she was the primary decision maker for the Child, that she paid for daycare and clothing, and that she provided health insurance for the Child. The question we must then answer is whether this was enough involvement by Rachel to compel a finding by the family court that she was a co-parent of the Child to defeat a *de facto* custodian claim. It was not.

We find the facts of this case analogous to those in *Ball v. Tatum*, 373 S.W.3d 458 (Ky. App. 2012). In *Ball*, this Court stated:

> Furthermore, taken as a whole, it appears Ball's parenting role was minimal at best – she knew she did not have to personally care for her daughter because Henrietta would make certain E.N.K. received her medication on time, attended therapy and had food to eat. Moreover, for reasons explained above, we do not read *Consalvi*[4] to require that a person seeking to be named a *de facto* custodian care for or provide for a child to the exclusion of all others. For all practical purposes, the Tatums had assumed the role of parents and stood in Ball's place because the evidence established they were caring for and providing for E.N.K. while Ball was partying.
>
> Ball also argues the Tatums could not have been E.N.K.'s primary financial supporters because the child received social security benefits, food stamps, child support and had a medical card. We disagree. While there was proof that Ball had other sources of funds available to her, there was no proof that funds Ball received from any of those sources were used for E.N.K.'s actual benefit. Even if outside funds had

---
[4] *Consalvi v. Cawood*, 63 S.W.3d 195 (Ky. App. 2001).

reached E.N.K., there is no indication they would have provided all of the child's needs.

*Id.* at 464-65.

The evidence regarding Rachel is clearly distinguishable from *Ball* in that Rachel was not just out partying. She was working and earning a degree for better employment. But the result of time spent with others in the parenting role is the same. Rachel was able to both work and earn her degree because the Huttons were effectively raising the Child. While Rachel's work ethic is to be commended, someone still had to care for the Child while Rachel was unable to do so. That role was filled by the Huttons.

Likewise, in *Allen v. Devine*, 178 S.W.3d 517 (Ky. App. 2005), this Court found the Allens to be *de facto* custodians of the two children at issue even though the parents visited the children regularly and provided WIC payments. The trial court found:

> In February of 2002, the Allens began keeping both Shayann and Austin on a regular basis in their home. According to Mr. Allen, Krystal visits the children a couple of times per week, and Kevin may visit the children every other week or so. Neither Krystal nor Kevin have had the children on an overnight basis since April of 2002. The Allens have provided essentially all of the food and clothing for the children although Krystal states that they contributed "WIC payments" when they were available and Kevin said he had put about $30.00 in one of the children's piggy bank.

-14-

*Id.* at 525. Accordingly, we find no error in the family court's conclusion that the Huttons were *de facto* custodians of the Child.

We now address Rachel's second issue; namely, whether the family court erred in its timesharing order. Rachel argues the family court abused its discretion in restricting Rachel's timesharing and by failing to consider the factors outlined in KRS 403.270.

KRS 403.270(2) contains a rebuttable presumption that joint custody and equal parenting time is in a child's best interest. While the family court granted Rachel and the Huttons joint custody of the Child consistent with the presumption, the court designated the Huttons as the primary residential custodians. The family court's order contains no findings to explain why it deviated from the presumption, or what factors it considered when making its determination of timesharing. "The judges presiding over family law matters must be mindful of the ramifications of their written orders. A bare-bone, conclusory order such as the one entered here, setting forth nothing but the final outcome, is inadequate and will enjoy no presumption of validity on appeal." *Keifer v. Keifer*, 354 S.W.3d 123, 126 (Ky. 2011). *See also Anderson v. Johnson*, 350 S.W.3d 453 (Ky. 2011).

Because we cannot determine from the order if the family court applied the later version of KRS 403.270(2), we must vacate and remand the order

as it relates to parenting time.  On remand, the family court must apply KRS

403.270(2) as amended in July 2018 (or any later revisions by the time the family

court proceeds further in this case).  The family court must specifically apply the

rebuttable presumption in favor of equal timesharing with the Child.  Should the

family court conclude the presumption has been rebutted, it must expressly state its

reasoning and craft a parenting time schedule that maximizes the Child's time with

Rachel while also ensuring the Child's best interests.

## CONCLUSION

For the foregoing reasons, the portion of the order granting the Huttons *de

facto* custodian status is affirmed, as the family court's findings of fact are

supported by the evidence and not clearly erroneous.  We likewise affirm the

award of joint custody.  The portion of the order as to timesharing is vacated, and

this matter is remanded to the family court for further fact-finding and analysis to

determine if the Huttons have rebutted the presumption of equal timesharing

pursuant to KRS 403.270(2).

While the family court may comply with the mandate of this Opinion

with only a review of the existing record, we will not limit the family court in its

determination of the best overall use of judicial resources for this continuing case.

Upon remand, the family court may choose to allow further evidence, including

evidence of intervening events, the status of the DNA conditions, or other information when deciding the timesharing issue.

ALL CONCUR.

BRIEF FOR APPELLANT:

Marie E. Troxler
Russell, Kentucky

BRIEF FOR APPELLEES:

Sharon E. Rowsey
Ashland, Kentucky