**Randy James WILLIAMS, Appellant**

v.

**Mellany Annette WILLIAMS, Appellee**

**NO. 2016-CA-001203-ME**

Court of Appeals of Kentucky.

JULY 28, 2017; 10:00 A.M.

MODIFIED: AUGUST 18, 2017; 10:00 A.M.

BRIEF FOR APPELLANT: Ashley W. White, Paducah, Kentucky.

BRIEF FOR APPELLEE: NO BRIEF FILED.

AMICUS BRIEF: Grace E. Stewart, Paducah, Kentucky.

BEFORE: ACREE, COMBS AND D. LAMBERT, JUDGES.

## OPINION

ACREE, JUDGE:

We must determine whether the McCracken Family Court abused its discretion when it denied Appellant Randy Williams' motion to modify visitation. We find no abuse, and affirm.

### FACTS AND PROCEDURE

Randy and Mellany married in 1999. Two children were born of the marriage, daughters A.W. and H.W. Both are still minors.

In late 2011, Mellany contacted the Cabinet for Health and Family Services and alleged that Randy had sexually abused A.W. The Cabinet was unable to substanti-

ate the claim. Not long after, Mellany reported a second similar incident to the Cabinet that was substantiated. Randy was charged with three counts of first-degree sexual abuse, victim under 12 years of age. *Commonwealth v. Randy Williams*, 12-CR-00070 (McCracken Cir. Ct., February 24, 2012). Around this same time, both A.W. and H.W. began receiving counseling and therapy services from the Purchase Area Sexual Assault Center (PASAC).[1]

As part of his defense in the criminal prosecution, Randy sought to access the children's therapy records. PASAC moved to quash the discovery pursuant to KRE[2] 507's psychotherapy-patient privilege.[3] The court in the criminal matter applied the standards and procedure set out in *Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky. 2003), and reviewed the therapy records *in camera* before producing very limited, possibly exculpatory, portions to Randy under seal.

Randy subsequently pleaded guilty to one count of first-degree wanton endangerment, and the sexual-abuse charges were amended and dismissed. He admitted as part of his plea that he "subjected a child A.W. to physical contact of an inappropriate nature which subjected A.W. to a substantial danger of physical injury." He was sentenced to three years' imprisonment, but was released shortly thereafter for time served.

While Randy was addressing his criminal charges, Mellany pursued divorce. She filed a dissolution petition, Randy was properly served, and the divorce proceeded. The family court held a final hearing and awarded Mellany sole custody of the children. It awarded Randy no visitation. In formulating its no-visitation decision, the court stated:

> The Respondent (hereinafter Father) has been found guilty of sexual abuse of the minor children and served 3 years for said offense. The children have been receiving counseling through PASAC for the past several years. The counselor for one of the children was present in Court, the counselor for the other child provided a letter to the Court stating that Father should have no contact with the children.
>
> Due to the history of sexual abuse, the substantiated allegations of sexual abuse with the Cabinet, and the recommendation of the counselors from PASAC, the Court finds that it is in the best interest of the minor children for Petitioner (hereinafter Mother) shall [sic] receive sole custody of the two children. Therefore, she shall have sole decision making regarding their health, welfare and religious upbringing. Father shall have NO visitation with the minor children at this time and until further orders of this court.

(R. 31-32). Randy did not appeal this final order.

---

1. H.W. received therapy because she also alleged Randy sexually abused her by making inappropriate comments about the female body, showing H.W. inappropriate photographs, and threatening to harm H.W. and her sister, A.W., if H.W. discussed the incidents.

2. Kentucky Rules of Evidence.

3. KRE 507 provides, in relevant part: "A patient, or the patient's authorized representative, has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purpose of diagnosis or treatment of the patient's mental condition, between the patient, the patient's psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family." KRE 507(b).

Instead, in October 2015, he filed a motion to modify visitation.[4] He said it was in his daughters' best interests to have contact with him, noting he had not seen or spoken to them in over three years. He also notified the court that he intended to seek access to the children's PASAC therapy records as evidence in the visitation hearing. The family court ordered Randy's counsel to submit a memorandum to the court outlining the basis upon which the family court could order PASAC to release those records. Randy's counsel complied and, on February 17, 2016, the family court entered an order directing PASAC to release the children's mental health records to the court, the parties, and counsel.

PASAC moved the court to reconsider its decision. It argued the records are protected by KRE 507's psychotherapist-patient privilege, asserting that it is an absolute privilege subject to the two-prong test established by the Kentucky Supreme Court in *Barroso, supra.* Randy opposed the motion.

At a hearing in March 2016, the parties asked the family court to delay ruling on PASAC's reconsideration motion because they anticipated resolving the issue by agreement. Soon thereafter, the parties submitted to the court an agreed order that included the following provisions:

> PASAC's records involving the two (2) minor children shall be released to the Court by May 5, 2016. The Court shall review the records *in camera* and shall determine what information in the records is relevant to the [visitation] ... decision before the Court. By May 25, 2016, the Court shall release to counsel only portions of the records that it determines are relevant. The records shall only be viewed by counsel (not the parties), .... Both parties will then have until June 8, 2016, to submit questions to the Court for it to use in interviewing the children.... The Court will interview the two (2) children separately.... Neither counsel nor the parties shall be present for the interview (except that [Mellany] may wait outside for the children while the interview is being conducted). The Court exercises full discretion in what questions are asked during the interviews and how the interviews are conducted.

(R. 98-99). The family court adopted and entered the order on April 25, 2016.

Notwithstanding the agreed order and somewhat inexplicably, the court conducted a hearing just two days later at which PASAC's reconsideration motion was heard and the issue of the agreed order discussed.[5] The family court took the matter under advisement and, on June 3, 2016, issued an order declaring *Commonwealth v. Barroso* to be controlling.

Pursuant to *Barroso*, the family court concluded it: "must first receive evidence to determine if the records should be reviewed *in camera*, then review the records *in camera* and then disclose only those

---

4. Randy styled his motion as one to "modify timesharing." However, in *Pennington v. Marcum*, 266 S.W.3d 759 (Ky. 2008), our Supreme Court explained that in a sole-custody regime the non-custodial parent receives "a limited period of access to the children through *visitation*, a term which denote[s] the right to see the children, but not to control them legally." *Id.* at 763 (emphasis added). "Time-sharing," on the other hand, is a joint-custody term, as the non-residential parent is also a legal custodian. *Id.* at 765. Here, Mellany was granted sole custody of the children and Randy was denied visitation, not timesharing. While his motion refers to modifying timesharing, he was actually seeking modification of the no-visitation order.

5. Randy failed to designate the hearing as part of the record. It is not available for our review.

records favorable [to] the requiring [requesting] party that cannot be elicited from another source." Having considered the parties' briefs, the family court found *in camera* review would likely assist it in making a determination as to Randy's request to resume visitation with the children. It ordered PASAC to release the records to the family court only.

On June 29, 2016, after conducting its *in camera* review, the court informed the parties that it had "reviewed the entire PASAC records and does not feel as though there is information in the records that is relevant to the [visitation] ... decision and therefore will not be releasing any records to counsel." (R. 120).

The family court then interviewed the children individually, in chambers, on July 6, 2016. At that time, H.W. was a month short of her twelfth birthday and A.W. was sixteen and a half years old. Randy was not present at the courthouse; Mellany was present, but waited outside the family judge's chambers. Grace Stewart, a victim advocate and attorney for PASAC, attended each interview.[6] She did not question the children or involve herself in the process.

A.W. told the judge, "I have decided I do not want any contact whatsoever [with Randy]. No phone calls, no visitation, no public visitation.... I just don't want anything to do with him." She said she had never felt safe around Randy, clarifying that she missed having a father figure, but did not miss Randy.

H.W. offered similar sentiments. She stated "I really don't want to see him. I don't want to have him in my life whatsoever. I don't want to talk to him. I don't

want to see him. But if I had to I wouldn't really mind, but I just, I really don't [want to]." H.W. denied being coached and stated she feared Randy. The judge informed both children she would not force them to visit with Randy.

At the conclusion of the interviews, the judge asked if Mellany was in the courthouse and stated, "I'll go tell her what we are going to do, too." The judge's conversation with Mellany is not contained in the record.

On July 18, 2016, following the children's interviews, the family court entered an order denying Randy's request for visitation. It stated:

> The Court finds both girls to be very articulate and passionate young women. They are smart and have a pleasant demeanor. Both girls appear to be level headed and were thoughtful in their responses and statements to the Court. The Court does not find it to be in the children's best interest for them to be forced into communicating or seeing their father. The Court notes that the girls have received extensive counseling and may come to a point in their lives when they are ready to reconnect with their father, however neither child is at that place at this time. The Court finds that forcing interaction or communication would be detrimental to the girls' emotional and mental wellbeing.

(R. 121). From this order, Randy appealed.

## STANDARD OF REVIEW

Modification of visitation is governed by KRS[7] 403.320(3). That statute allows a family court to modify visitation "whenever modification would serve the best interests

---

6. While the PASAC victim advocate is also an attorney and represented PASAC at the trial level and before this Court, the record indicates she attended the interviews in her ca-

pacity as a victim advocate, not an attorney, at the request of the minor children.

7. Kentucky Revised Statute.

of the child...." *Id.* However, the court "shall not restrict a parent's visitation rights" unless allowing visitation would seriously endanger "the child's physical, mental, moral, or emotional health." *Id.* "Every case will present its own unique facts," and the modification of visitation "must be decided in the sound discretion of the trial court." *Pennington v. Marcum,* 266 S.W.3d 759, 769 (Ky. 2008). "Since 'serious endangerment' or 'best interests' is not defined, it is left to the sound discretion of the trial court whether the party" seeking modification has met his or her burden. *Id.*

■ "[T]his Court will only reverse a [family] court's determinations as to visitation if they constitute a manifest abuse of discretion, or were clearly erroneous in light of the facts and circumstances of the case." *Drury v. Drury,* 32 S.W.3d 521, 525 (Ky. App. 2000) (citing *Wilhelm v. Wilhelm,* 504 S.W.2d 699, 700 (Ky. 1973), overruled on other grounds).

## ANALYSIS

Randy's claims of error focus on the family court's methods in ruling that denial of visitation should continue. He argues the family court erred by denying him access to the children's PASAC therapy records, and also erred by the manner in which it conducted the children's interviews. These errors, Randy argues, provide a sufficient footing upon which this Court should reverse the family court's visitation decision. We are not persuaded.

### *The family court did not err in refusing to disclose counseling records.*

Randy first takes issue with the family court's decision not to release the children's PASAC records to counsel and the

parties. He faults the family court for applying the standards outlined in *Barroso, supra,* a criminal case, and argues that the family court should have released the records pursuant to the older case of *Bond v. Bond,* 887 S.W.2d 558 (Ky. App. 1994), a child custody case he asserts is directly on point. Randy contends *Bond* established a rule of law that, in any child custody case, an automatic waiver applies to the otherwise privileged and confidential mental health records of the parties' children.

We will examine *Barroso* and *Bond,* in historical context, beginning with the case upon which *Bond* rests—*Atwood v. Atwood,* 550 S.W.2d 465 (Ky. 1976), which recognized that a specific legislative exception to the psychiatrist-patient privilege applies by operation of law to a parent seeking custody.

In *Atwood,* our Supreme Court said a mother, "[i]n seeking the custody of the children ... made her mental condition an element to be considered by the court in awarding her custody." *Atwood,* 550 S.W.2d at 467; *see Allen v. Department for Human Resources,* 540 S.W.2d 597, 598-99 (Ky. 1976) ("Appellant clearly put her mental condition in issue by the allegation in her petition to be granted custody of the children"; the exception in KRS 421.215(3)(c) [8] to the psychiatrist-patient privilege therefore applied.). The Court concluded the circuit court was compelled, legislatively, to consider evidence of the mother's mental state unimpeded by her claim of psychiatrist-patient privilege. The legislative provisions requiring that conclusion were KRS 403.270(1)(e) and KRS 421.215(3)(c).

---

**8.** "[T]he language of the statutory psychiatrist-patient privilege in effect at that time, KRS 421.215(2) and (3) (repealed, 1990 Ky. Acts, ch. 88, § 92, eff. July 1, 1992 pursuant to 1992 Ky. Acts, ch. 324, § 33), was virtually identical to that of KRE 507(b) and (c)." *Commonwealth v. Barroso,* 122 S.W.3d 554, 562 (Ky. 2003).

The first statute makes "'[t]he mental and physical health of all individuals involved'" an issue in every custody case. *Atwood*, 550 S.W.2d at 467 (quoting KRS 403.270(1)(e)). The second statute, identifying exceptions to the privilege, says "privileged communications between psychiatrist and patient exist with an absolute certainty except in three instances, [one of which is] '[i]n a civil proceeding in which the patient introduces his mental condition as an element of his claim or defense....'" *Id.* at 466 (quoting Enact. Acts 1966, ch. 121, ss 1 to 3, codified as KRS 421.215(3)(c)).

Normally, the exception to the psychiatrist-patient privilege identified in KRS 421.215(3)(c) would have required the judge to balance the policies in favor of the privilege with the need for disclosure in the particular case. KRS 421.215(3)(c) (disallowing the exception unless "the judge finds that it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychiatrist be protected"). However, the Supreme Court singled out custody disputes as "civil proceeding[s] of momentous proportions." *Atwood*, 550 S.W.2d at 466. It then dispensed with the need for such balancing, concluding that "[t]he standard of KRS 421.215(3)(c) has been met by operation of law." *Id.* at 467; *accord Dudley v. Stevens*, 338 S.W.3d 774, 776 (Ky. 2011) (applying exception in KRE 507, stating "Appellant waived her psychotherapist-patient privilege per KRE

507(c)(3) by asserting a claim implicating her mental condition"). The express exception contained in KRS 421.215(3)(c), and now KRE 507(c)(3), therefore unavoidably applied.

Randy, citing only *Bond*, claims our jurisprudence has leaped from the statutory exception applied in *Atwood* to now hold in all custody disputes that there is an "automatic waiver" not only as to the parent's claim of privilege, but as to any claim of privilege by the children who are the subjects of the custody dispute. We do not agree with Randy, even while at least one legal commentator does.[9]

By definition, an "automatic" waiver would be one a court recognizes without conscious thought or from force of habit. *See* Random House Unabridged Dictionary 140 (2d ed. 1987). Jurisprudence is not intended to evolve that way but, perhaps occasionally, it does. Consequently, it is wise, from time to time, to retrace the path of our jurisprudence to see if what was once a conscious decision has degenerated to force of habit.

To begin, we have read *Atwood* carefully and nowhere in that case does either word "automatic" or "waiver" appear. Nevertheless, the phrase "automatic waiver" has been used as shorthand for the Supreme Court's analysis in *Atwood*. It appears this Court was the first to take that shortcut when we decided *Harris v. Commonwealth*, 688 S.W.2d 338 (Ky. App. 1984).[10]

---

9. "Kentucky provides for an automatic waiver of the child's privilege in custody cases." Ike Vanden Eykel & Emily Miskel, *The Mental Health Privilege in Divorce and Custody Cases*, 25 J. Am. Acad. Matrim. Law. 453, 467 (2013) (citing *Bond*, 887 S.W.2d at 561).

10. Other jurisdictions have done the same. New Jersey's Supreme Court, in its critique of *Atwood*, also called the waiver "automatic." In *Kinsella v. Kinsella*, 150 N.J. 276, 696 A.2d 556 (1997), the court first noted its "review of

the law of other jurisdictions reveals that most courts do not pierce the psychotherapist-patient privilege *automatically* in disputes over the best interests of the child, but may require disclosure only after careful balancing of the policies in favor of the privilege with the need for disclosure in the specific case before the court." *Id.* at 581 (emphasis added). That Court then cited *Atwood* as "holding that [in Kentucky] seeking custody *automatically waives* psychiatrist-patient privilege[]"

*Harris* was our review of an RCr[11] 11.42 appeal. The issue was whether Harris could assert the attorney-client privilege to thwart cross-examination of his legal counsel who had taken the stand to testify. We distilled the holding in *Atwood* to a simple short phrase and used analogy to address Harris's claim to the privilege: "just as mental health is immediately placed into issue in custody proceedings, thereby resulting in an *automatic waiver* of the psychiatrist-patient privilege [*Atwood v. Atwood*, —— Ky. ——, 550 S.W.2d 465 (1976)], it must be held that when ineffective assistance of counsel is raised via an 11.42, the statutory attorney-client privilege is lost." *Id.* at 340 (brackets and bracketed citation in original; emphasis added).

Boiling *Atwood* down to a snippet allowed for an efficient analogy, but it did not, and was not intended to, illuminate our understanding of the Supreme Court case. Still, we did not hesitate to repeat that cursory description—"automatic waiver"—when we decided *Bond*.

In *Bond*, we were tasked with determining the soundness of a child's psychiatrist-patient privilege in a custody case, rather than the parent's privilege as in *Atwood*. Ignoring the fact that *Atwood* was based on a specific statutory exception, we began our analysis by citing *Harris* and saying: "this Court in construing the effect of the *Atwood* decision, has indicated that because mental health is an immediate issue in custody disputes, an *automatic waiver* of the psychiatrist-patient privilege results. *See Harris....*" *Bond*, 887 S.W.2d at 561 (emphasis added). Of course, we were exaggerating when we said *Harris* was "construing" *Atwood*. But, we did then elaborate. We said:

> While *Atwood* deals with a privilege asserted by the mother on her own behalf, the Court pointed out that the mental health of *all* individuals involved is relevant. This includes those children who are the very subjects of custody disputes. *The automatic waiver is just as applicable to them as it is to the parents.*

*Id.* (emphasis added). This last sentence is the touchstone of Randy's argument.

At first blush, this language seems a straight-forward expansion of *Atwood* both as to the extent of the so-called waiver (as opposed to *Atwood*'s analysis of an exception) and its automatic nature. However, there are several stronger reasons to read *Bond* more narrowly.

First, we clarified our own holding within the body of *Bond*'s majority opinion.[12]

---

*Id.* (emphasis added). According to one researcher, a total of "11 states ... allow for the *automatic waiver* of the psychologist-client privilege when custody is sought[, recognizing] that the statutory factors considered by the courts in determining custody and what is in the children's best interests are elements of the custody case, and thus when a party files for custody, the privilege is waived as they place their mental health at issue." Amy J. Amundsen, *A State of Confusion and A Need for Clarity the Fallout from Culbertson I and II*, Tenn. B.J., May 2016, at 14 (2016) (emphasis added; citations and internal quotation marks omitted).

11. Kentucky Rules of Criminal Procedure.

12. *Bond* was not unanimous. Judge Howerton wrote the opinion and, on this point, Judge Johnstone concurred. Judge Wilhoit dissented, however, stating:

> I do not believe that the cases cited ... support the result reached as to the patient-psychologist privilege. The cases cited deal with the waiver of a personal evidentiary privilege by a party to an action who is himself or herself asserting a claim on which the privileged evidence has a material bearing. The infant involved in this case is not a party to the action and is not asserting any claim. Indeed, the infant is not *sui juris* and is procedurally incapable of doing so. Although the opinion infers otherwise, an evidentiary privilege is not

Our holding, in fact, was that "the trial court committed reversible error when it precluded [the child's psychiatrist's] testimony *based upon the privilege asserted by [the custodial parent* and held] that the custodial parent may not invoke the psychotherapist-patient privilege for a child in custody litigation...." *Id.* (emphasis added). That is, we held a custodial parent and party to the proceeding cannot prevent the introduction of evidence against himself by asserting his child's psychiatrist-patient privilege. Prohibiting a parent from asserting his child's privilege is not equivalent to automatically waiving the child's privilege.

Second, in *Bond* we did not reverse with instructions that the trial court automatically waive the privilege. Rather, after clarifying our holding, we said "the question remains as to how best to proceed." *Id.* Obviously, the distinction between *Atwood* and *Bond* is significant—it makes a great deal of difference that the child is not a party. We made that point rather poignantly when we said "the child becomes the pawn—the prize after which two people seek[.]" *Id.* at 560. Simply put, *Bond* was a harder case than *Atwood*, or *Harris* for that matter. Reading together KRS 403.270(1)(e) and KRS 421.215(3)(c)—now KRE 507(c)(3)—does not impact a "pawn" at all as it does a party. The pawn does not voluntarily put his or her own mental health in play and thereby implicate an express statutory exception. Therefore, we could not say in *Bond* and we cannot say now, as the Supreme Court *could* say in *Atwood*, that the standard for application of an exception to the privilege "has been met by operation of law." In *Bond*, unlike *Atwood*, we left the question's ultimate resolution to the family court, remanding the case and al-

lowing very broad discretion for that court to proceed. We offered the most general guidance, stating only:

> We will not attempt to require any specific procedure by the trial court, but allow broad discretion. The judge may personally and directly interview the therapist to determine what, if any, information is relevant and material for disclosure; or, the judge may appoint a guardian ad litem pursuant to CR 17.03 for the sole purpose of determining the best interests of the child and for recommending whether, and to what extent, the privilege should be waived.

*Id.* These instructions on remand are entirely inconsistent with Randy's argument for an automatic waiver of the children's psychiatrist-patient privilege.

Third, in *Bond*, unlike *Atwood*, the patient's right to rely on the promise of confidentiality remains intact despite the patient—the child—being made a pawn in the courtroom. As we said:

> It is likely that the patient (child) has obtained assurances that the disclosures will remain secret. Neither the child nor the therapist wish to reveal the confidences.

*Id.* That promise of confidentiality once came from our legislature, KRS 421.215, and now comes from our Supreme Court. KRE 507. That "promise of confidentiality would have little value if the patient were aware that the privilege would not be honored in a f[amily] court" in Kentucky. *Jaffee v. Redmond,* 518 U.S. 1, 13, 116 S.Ct. 1923, 1930, 135 L.Ed. 2d 337 (1996). The child in a custody battle has done absolutely nothing to waive her right to rely on that promise, and on that privilege. *Shifflet*

---

lost simply because the evidence subject to it is relevant. *See Southern Bluegrass Mental Health v. Angelucci,* —— Ky.App. ——, 609 S.W.2d 931 (1980). There would be no need

to establish a privilege for irrelevant evidence.
*Bond,* 887 S.W.2d at 562 (Wilhoit, J., dissenting).

*v. Shifflet*, 891 S.W.2d 392, 394 (Ky. 1995) ("Waiver is essentially unilateral, resulting as a legal consequence from some act or conduct of the party against whom it operates, and no act of the party in whose favor it is made is necessary to complete it"; citation, internal quotation marks and brackets omitted). Randy's theory of an automatic waiver is contrary to the waiver standard expressed in *Shifflet*.

Fourth, the author of *Bond*'s majority opinion, Judge Howerton, posited in a case previous to *Bond* that this Court could not even recognize such a waiver. In *Amburgey v. Central Kentucky Regional Mental Health*, he said:

> Confidentiality is essential if psychiatrists are to be in a position to successfully treat their patients. A thorough understanding of the patient's problems and feelings must be divulged if treatment is to be appropriate and effective. The legislature has seen fit to make such communications privileged. The privilege granted by KRS 421.215 [now KRS 507] is absolute in the absence of the legislated and recognized exceptions. *Atwood v. Atwood*, —— Ky. ——, 550 S.W.2d 465 (1976). It is *not for this Court to take it upon itself to waive the privilege for someone or to carve out exceptions.*

663 S.W.2d 952, 953 (Ky. App. 1983) (emphasis added) (citing *Southern Bluegrass Mental Health and Mental Retardation Bd., Inc. v. Angelucci*, 609 S.W.2d 931, 934 (Ky. App. 1980) ("For this court to waive the [psychiatrist-patient] privilege or commence to carve out exceptions is to erode any reason in keeping with consistency")). Randy's argument that Judge Howerton's opinion in *Bond* carved out an automatic waiver for children is inconsistent with the principle of appellate review Judge Howerton himself earlier articulated in *Amburgey*.

Fifth, almost ten years after we rendered *Bond*, our Supreme Court interpreted *Bond* narrowly as simply "holding in [a] child custody case that parents could not assert *or waive* [the] child's privilege and speculating, but not holding, that [the] trial judge or guardian ad litem could do so on behalf of [the] child[.]" *Commonwealth v. Barroso*, 122 S.W.3d 554, 565 (Ky. 2003) (emphasis added). The Supreme Court did not interpret *Bond* as recognizing any kind of waiver, much less an automatic waiver, of a child's privilege.

Sixth, when deciding *Barroso*, our Supreme Court said the psychiatrist-patient privilege "is not subject to avoidance because of a 'need' for the evidence." *Id.* at 558 (citation omitted). The Court thus addressed Judge Wilhoit's concern expressed in his *Bond* dissent that: "Although the opinion infers otherwise, an evidentiary privilege is not lost simply because the evidence subject to it is relevant." *Bond*, 887 S.W.2d at 562 (Wilhoit, J., dissenting). Children do not lose the privilege automatically simply because what they said in confidence to a therapist could help or harm a parent's efforts to obtain custody.

Randy urges us to take no account of *Barroso* because it is a criminal case. The issue in *Barroso* was whether a prosecution witness's absolute privilege under KRE 507 must yield to a criminal defendant's constitutional right to obtain exculpatory evidence. The Supreme Court discussed the problem of "fishing expeditions" into witnesses' confidential therapy records, and concluded that more restrictive standards were needed, even when constitutional rights afforded criminal defendants came into play. *Barroso*, 122 S.W.3d at 558, 563. We see no difference when the constitutional right is the custody of one's child. At least we see no difference that would cause us to ignore *Barroso* as authority.

Using *Barroso* as guidance is consistent with *Bond*. In both *Bond* and *Barroso*, none of the exceptions to the privilege set forth either in KRS 421.215 or KRE 507 applied. *See Barroso*, 122 S.W.3d at 558 ("Other than the three specified exceptions, *none of which applies here*, the psychotherapist-patient privilege is an 'absolute'"; emphasis added). None of those exceptions applies in the case now before us. Therefore, this case is more like *Barroso* than it is like *Atwood*, a case applying a specific statutory exception. The family court did not err in turning to *Barroso*, and the procedure the family court used satisfies the requirements of both *Barroso* and *Bond*.[13]

■ Even more, the family court followed (as evidenced by the June 3 and June 29, 2016 orders) a procedure Randy took part in creating (as reflected in the April 25, 2016 agreed order). The record shows the family court, in all ways, followed the procedure established by the parties' agreed order for reviewing the children's PASAC records. After concluding there was sufficient evidence to authorize *in camera* examination of the records, and after undertaking that examination, the family court then expressly found *no information relevant* to the visitation issue and declined to release any records to the parties or their counsels. *See* KRE 402 ("Evidence which is not relevant is not admissible."). No waiver occurred; no exception applied.

We cannot say the family court's finding was clearly erroneous or otherwise consti-

tuted reversible error. Accordingly, on this issue, we affirm.

### The family court did not err in the way it interviewed the parties' daughters.

Randy next takes issue with the family court's interview methods. Specifically, he argues the family court erred: (1) by allowing PASAC's counsel to be present and to influence the children's interviews with no notice to either party; (2) by denying both parties the opportunity to submit questions after viewing the PASAC records to rebut the children's statements that they missed their father; (3) and by having impermissible *ex parte* communications with Mellany.

Randy correctly points out that KRE 611 empowers the family court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) Make the interrogation and presentation effective for the ascertainment of the truth[.]" KRE 611(a)(1). Even more relevant to this case, however, is the April 25, 2016 agreed order that: permitted each party to submit questions to the family court for it to use in interviewing the children; prohibited both parents from attending the interviews; and afforded the family court "*full discretion in what questions are asked during the interview* and *how the interviews are conducted.*" (R. 98-99) (emphasis added).

■ The family court had full discretion to conduct the children's interviews in any manner that fit these parameters. This discretion included allowing a PASAC vic-

---

**13.** Significantly, the family court's procedure also satisfies the mandatory threshold established in *Stidham v. Clark*, 74 S.W.3d 719 (Ky. 2002) (cited in *Barroso*) that:

[B]efore a ... court may engage in *in camera* review at the request of the party opposing the privilege, that party must present evidence sufficient to support a reasonable belief that *in camera* review may yield evi-

dence that establishes the exception's applicability.... [T]he threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged.

*Id.* at 727 (quoting *United States v. Zolin*, 491 U.S. 554, 574-75, 109 S.Ct. 2619, 2632, 105 L.Ed.2d 469 (1989)).

tim advocate to attend the interviews for the benefit of the children. We have carefully reviewed both interviews and observed that the PASAC advocate did not participate in or influence the interviews in any meaningful way. We see nothing wrong with, and certainly no abuse of discretion in, the family court's decision. It does not constitute reversible error.

The family court also did not deny Randy—or Mellany—the opportunity to submit questions. Both had the right to do so pursuant to the April 25, 2016 agreed order; Randy simply chose not to do so.[14] The fact that no PASAC records were deemed subject to waiver did not deprive the parties the opportunity to submit questions. As noted, from the criminal proceeding, Randy was already privy to several portions of the children's therapy records that appeared favorable to his cause, including A.W.'s statement in 2012 that she "miss[ed] him [Randy] somewhat" and Mellany's admission in 2013 that A.W. had stated "she missed Randy in some text messages." He could have formulated questions based on this knowledge. But he did not.

Finally, the family judge stated at the conclusion of H.W.'s interview that she was going to notify Mellany of "what we are going to do." Clearly the family judge intended to simply inform Mellany that she was denying Randy's visitation motion.

Assuming this *ex parte* contact was impermissible, *see* SCR [15] 4.300B(7) (allowing certain *ex parte* communications provided all the criteria in the rule are met), then to the extent it could be called error, it was most certainly harmless. CR [16] 61.01.[17] We are confident the family judge did nothing more than advise Mellany of a decision, already made, and that an order would be forthcoming to memorialize it. This communication did not affect the substantial rights of either party and is not inconsistent with substantial justice.

We find no error in the manner in which the family court interviewed the children.

## CONCLUSION

The family court did not abuse its discretion or otherwise err when it denied Randy's motion to modify its previous no-visitation order. We affirm the McCracken Family Court's July 18, 2016 order.

ALL CONCUR.

14. The family court reminded the parties of their right to submit questions in its June 3, 2016 order, noting "The Court is cognizant of the short amount of time this places on the parties, not only to brief the issue, but also to review the records and *submit questions, pursuant to the Agreed Order.*"

15. Supreme Court Rule.

16. Kentucky Rules of Civil Procedure.

17. CR 61.01 provides:
No error in either the admission or the exclusion of evidence and no error or defect

in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.